UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

JEFFREY W. and GERMAINE W. ,
as Parents/Guardians/Next Friends of
Z.W., a Minor Individual with a Disability,

    *Plaintiff-Appellant*,

v.                                   **Case No. SA-21-CV-0636-JKP**

SCHERTZ-CIBOLO-UNIVERSAL CITY
INDEPENDENT SCHOOL DISTRICT,

    *Defendant-Appellee*.

**MEMORANDUM OPINION AND ORDER**

    This is an appeal from an administrative due process hearing under the Individuals with Disabilities Education Act ("IDEA"). Before the Court is a sealed, certified copy of the administrative record made in Texas Education Agency special education hearing Docket No. 380-SE-0719. *See Certification of the Administrative Record* (ECF No. 15).[1] And in accordance with its *Briefing Order* (ECF No. 12), the Court has under consideration (1) *Plaintiff's Motion for Judgment on the Administrative Record* (ECF No. 16), which the Court construes and considers as *Appellant's Brief*; (2) an *Appendix of Plaintiff's Statement of Material Facts* (ECF No. 16-1); (3) an *Appellate Brief of Defendant Schertz-Cibolo-Universal City ISD ("SCUCISD")* (ECF No. 18); and (4) *Plaintiff's Reply Brief* (ECF No. 19). The parties have informed the Court that they are not requesting additional evidence and there are no issues requiring expedited briefing or resolution. *See* ECF No. 11. The appellate record is complete, and the Court is prepared to rule. After considering the full appellate record, the arguments of the parties, and the applicable law, the Court affirms the Decision of the Hearing Officer (R. 1-25) and finds that the preponderance of the

---

[1] The Administrative Record consists of five volumes. *See* R. 1-5546. The appealed decision, administrative pleadings, and correspondence comprise Volume I. *See* R. 1-568. Volumes II through IV contain the proffered exhibits. *See* R. 569-744 (joint exhibits), R. 745-3193 (Plaintiff's exhibits); R. 3194-3985 (Defendant's exhibits). Volume V contains transcripts of all transcribed proceedings. In general, the Court will cite to the administrative record generically as "R." with a page reference to the sequential page-numbering at the lower right-hand corner.

evidence supports finding that the challenged individualized education programs appropriately address Z.W.'s educational needs and that the District was able to provide him a free appropriate public education for the school years in question. Z.W. has not carried his burden to show otherwise. Like the Hearing Officer (also referred to as Special Education Hearing Officer ("SEHO")), the Court thus has no need to address whether any private school or facility was an appropriate placement and Z.W. is not entitled to reimbursement for his unilateral placements in private schools or facilities.

## I. BACKGROUND

At the time of this appeal, Plaintiff-Appellant Z.W. was a fifteen-year-old who qualified for special education services with the Schertz-Cibolo-Universal City Independent School District ("SCUCISD," or "the District," "Defendant," or "Appellee") under eligibility categories of Autism, Intellectual Disability, Other Health Impairment, and Speech. R. 690. His parents brought this appeal on his behalf. References to either parent, the family, or the parents refer to Z.W.'s family or family members. This appeal concerns Z.W.'s Seventh (2019-2020) and Eighth Grade (2020-2021) school years. The most relevant records thus concern those years; related Admission, Review, and Dismissal Committee ("ARD" or "ARDC") meetings; and formulated Individualized Education Programs ("IEPs"), Full Individual Evaluations ("FIEs"), and Behavior Intervention Plans ("BIPs").[2] But earlier records remain pertinent for background context and understanding events preceding the relevant school years. R. 5.

---

[2] *See* R. 640-87 (June 12, 2019 ARDC with IEP for services June 12, 2019, through June 11, 2020 (reconvened from May 24 and 31, 2019)); R. 690-741 (Nov. 19, 2019 ARDC with IEP for services June 12, 2019, through June 11, 2020); R. 1455-88 (Oct. 11, 2017 annual review of IEP, including FIE); R. 2417-61 (Nov. 5, 2019 Review of Existing Evaluation Data ("REED") and FIE); R. 3225-75 (Mar. 4, 2020 ARDC with IEP for services for June 12, 2019, through June 11, 2020); R. 3278-3334 (Sept. 30, 2020 ARDC with IEP for services for Sept. 30, 2020, through Sept. 29, 2021). Although the parties submitted joint exhibits, they independently submitted the November 5, 2019 REED and FIE. *Compare* R. 2417-61 *with* R. 3335-79.

**A. Initial Enrollment and Early Student Records**

The District conducted its first FIE for Z.W. prior to his enrollment at school. *See* R. 750-58 (FIE dated Dec. 5, 2008). It also held an initial ARDC meeting and formulated his initial IEP to commence in January 2009. R. 774-93. During the subsequent years, the District continued to evaluate Z.W. and provide special education services. *See*, *e.g.*, R. 888-913 (Dec. 2011 ARD); R. 914-27 (Mar. 2012 ARD); R. 949-69 (Nov. 2014 Addendum to FIE); R. 971-1026 (Dec. 2014 ARD); R. 1076-98 (Apr. 2015 ARD); R. 1100-50 (Dec. 2015 ARD). During this time, Z.W.'s private physician was Patricia M. Harkins, MD. *See*, *e.g.*, R. 946-47.

In Third Grade (2014-2015), Z.W.'s behavioral issues "became very much more serious, much more problematic." R. 4116. At that point, his parents often had to pick him up from school early. R. 4116-17. Thus, "by around March and certainly into April 2015," the parents were anxious about phone calls to pick him up early. R. 4117. At an April 1, 2015 ARDC meeting, the District considered changing its schedule of services to include homebound services. R. 1076. At that time, school was "not the place for" Z.W. R. 1077. The committee agreed to provide homebound services and recognized that it was "normally 2 sessions of 2 hours." *Id*. The recommended schedule of services was to be in effect from April to December 2015, and included four hours of homebound special education services, occupational therapy once per nine weeks for twenty-five minutes, and speech services four times per nine weeks for thirty minutes. R. 1077-78.

Z.W. became homebound educated on April 10, 2015, and remained in homebound services for the remainder of the 2014-2015 school year. R. 928. He resumed full-time homebound services in August 2015, moved to chronic homebound per recommendation of Dr. Harkins, and attended school on an abbreviated schedule for the second semester of the 2015-2016 school year (Fourth Grade). R. 1027.

On December 2, 2015, the District conducted an annual review of Z.W.'s educational

program. *See* R. 1100-41. It noted that he had "attended school for a full day and was in the ALE [(Adaptive Learning Environment)] classroom until April of 2015 when he went homebound due to severe behaviors." R. 1101. The committee determined that Z.W. would "receive support as needed in homebound, ALE and general education setting as applicable from the Student Support Staff." R. 1136. He would "continue full-time homebound until January 5," 2016, and then "begin attending the ALE program . . . with an abbreviated schedule (120 minutes per day)." *Id*. The District would leave chronic homebound "available as needed." *Id*.

On December 28, 2015, Dr. Harkins recommended that the District readmit Z.W. "to class for 1-2 hours per day as long as he can tolerate it." R. 1150. She further recommended that he "continue homebound education" if Z.W. was "unable to tolerate the classroom environment." *Id*. The parents hoped that Z.W. would be able to increase his school time as the semester progressed. R. 4120. By the end of the semester, Z.W. had increased his school time by an hour each day, but his behavior worsened. R. 4121. His parents decided to have him repeat Fourth Grade. R. 1155, 4121.They explained that they wanted him

> to remain at Schertz Elementary for the 2016-17 school year because, after many months of refusing to go to school, he is now willing to go to school at Schertz Elementary. Though he is still anxious, he is confident in his teachers and comfortable enough in his surroundings. He has made good academic and social progress, and we think he will continue to do so by staying at this school.

R. 1157. His teacher, Teresa Gooch, recognized the behavioral challenges with Z.W., saw progress, stated a future goal "for him to be at school all day," and agreed that at that time, "it would be best for [him] to stay here at Schertz Elementary for the 2016-2017 school year so that he can continue to make progress academically, behaviorally, and socially." R. 1158. The parents complimented her regarding her instruction and wanted Z.W. retained in the Fourth Grade so that he would be able to stay with her. R. 5266.

For the retained Fourth Grade year (2016-2017 school year), Z.W. "qualified for chronic

4

homebound but never accessed homebound." R. 1152. When he began that school year, the District placed him "in the ALE classroom . . . for a couple of hours a day." R. 5260. On September 9, 2016, the District revised Z.W.'s annual ARD, and based on recommendation of Dr. Harkins it extended Z.W.'s school schedule by thirty minutes. R. 1159. Z.W. would thus "attend school from 7:40AM – 10:00AM," with homebound as a continued option as needed. R. 1159-60. The District amended the December 2015 IEP to be implemented on September 26, 2016. R. 1169. This amendment was to increase Z.W.'s school day within his abbreviated schedule and to update transportation services consistent with the ARD revision. *Id*. At that time, the District noted that Z.W. "continues to make great progress." *Id*.

The District conducted an annual review regarding Z.W. on December 14, 2016. *See* R. 575-616. At that time, transitional services were "not age appropriate" and Z.W.'s behavior did not impede his learning or that of others. R. 578. The District noted that the next-year services would be provided at Jordan. R. 616. It also set out his "Present Levels of Academic Achievement and Functional Performance" ("PLAAFP") regarding reading, speech and related services, occupational therapy, written expression, math, behavior, functional, and other (Science/Social Studies). R. 576-77.

At that point, Z.W. could read "approximately 30 sight words" and was reading at the end of kindergarten/beginning first grade level "as long as there w[ere] pictures with it." R. 5262. Ninety percent of the time, he could "answer comprehension question[s] when given [three choices] that ha[d] visual/word pairing. R. 576. With choices, he was "identifying new vocabulary, plot, and character interaction" seventy percent of the time. *Id*.

With respect to writing, Z.W. could "trace words, numbers, and sentences 80% of the time"; was "forming upper and lower case letters legibly using basic conventions of print 25% of the time," and when "reminded to slow down" and "given 3 choices," he was "able to choose the

correct editing for capitalization and punctuation (period or question mark) 6 out of 10 opportunities." R. 577. He could write his name and copy words or sentences independently. R. 5263. He knew his letters. *Id*.

Z.W. also knew his numbers. *Id*. He could "rote count 1-100 with a visual or verbal cue." R. at 577. He "was able to do one-to-one correspondence" and "could add or subtract double-digit numbers without regrouping using manipulatives." R. 5262. He was "adding/subtracting 7 out of 10 opportunities." R. 577. He could identify and use "patterns to solve problem and data." *Id*. He was "using measurement to solve problem and identifying temperature and time 50% of the time." *Id*. Seventy percent of the time he could "identify one and two-dimensional geometric figures." *Id*.

Behaviorally, Z.W. "had his good days and his bad days." R. 5264. But his special education teacher, Ms. Gooch,[3] testified that she "was able to extinguish all of his behaviors" seventy percent of the time, and he could also "self-regulate his behaviors." *Id*. He acted out and had behavioral issues, but he made progress on his behavior during the fall semester of 2016. *Id*. She had never needed to restrain him or place him in isolation. R. 5264-65. She would use visual supports, every teaching strategy that she had at her disposal, including ABA (applied behavioral analysis) strategies and a structured room. R. 5265. He responded very well to her strategies. *Id*.

Z.W. withdrew from school in December 2016. R. 1152. The family temporarily moved to England that month and returned in April 2017. R. 4122-23, 5043, 5265-66. Although Z.W. was still in Fourth Grade when he returned from overseas, R. 4123, he did not return to the District for the rest of that school year, R. 5266.

---

[3] Ms. Gooch has a psychology degree, and at the time of the administrative hearing on December 14, 2020, she was an "EC through 4 general ed teacher and EC through 12 a special ed teacher," who had "been teaching for fifteen years." R. 5258. She was a certified teacher who had worked fifteen years working with autistic students. *Id*. At that time, she had worked with students with intellectual disabilities for thirty-five total years. *Id*. She gained the additional twenty years of experience as a mother with an intellectually disabled child. R. 5259. She knew Z.W. from teaching in his special education classroom from kindergarten through Second Grade, and then again in the Fourth Grade. R. 5260. She was also his teacher during the 2016-2017 school year. *Id*. Z.W. was not "the most behaviorally challenged student that [she had] been involved with or instructed." *Id*.

In June 2017, the District explained that reenrolling a student who had previously withdrawn requires the District "to do a transfer ARD/meeting to discuss, agree upon and put in place special education services." R. 1185. During the summer of 2017, the plan was for Z.W. to attend school for "2+ hours per day." R. 1178. The parents were requesting an ARDC meeting for August 2017, but did not think it would "be a marathon ARD, as we were likely trying to pick up with the same schedule / routine / services that we left off with in December." R. 1180. The District agreed that this would not likely be "a marathon ARD meeting," given the meeting held "close to end of this past school year." *Id*. At that point, Z.W.'s most recent ARD was December 2016. R. 1185.

On June 13, 2017, Dr. Harkins requested that, "[e]ffective August 28, 2017," Z.W. be readmitted "to class for 2-4 hours per day as long as he can tolerate." R. 3983. She recommended that homebound education continue if he was "unable to tolerate the classroom environment." *Id*.

In August 2017, Z.W. returned to the school District. R. 4542. Transitioning to the Fifth Grade (2017-2018 school year), he was at a different location within the District (Jordan Intermediate) with different teachers and staff. R. 4123-25. Although the parents started him with only a couple of hours a day at school with a plan to build from there, the results were "absolutely disastrous" according to the mother. R. 4125. On September 25, 2017, the parents requested to "resume homebounding" because "continued attempts to bring [their son] to school will result in increased anxiety and greater frustration." R. 1196. Z.W. thus returned to homebound services. R. 4127.

The District provided homebound services in October 2017. R. 1434-43. During this placement, Z.W. was scheduled to receive four hours of instruction each week, but he often received less—on average it was maybe one or two hours a week, due to scheduling issues. R. 4128. Z.W. did not react well to homebound placement, "he was extremely agitated," he would not cooperate, and he would run away to another room or outside. *Id*.

The District annually reviewed Z.W.'s program on October 11, 2017. R. 1455-88. This

review included an updated FIE. *See* R. 1455. A review of available and existing evaluation data indicated that no new testing was required for the FIE. *Id*. In late October 2017, the parents requested that the District place Z.W. at a private school, One for Autism ("OFA"). R. 618, 1402. By email dated November 2, 2017, the parents gave formal notice of their "intent to disenroll [him] from the District on Monday, November 13, 2017," and "unilaterally place [him] with One For Autism." R. 1402. The parents ultimately enrolled him in at OFA for sixth and seventh grades. R. 4128-29.

On November 8, 2017, the District summarized the annual review and stated that Z.W. "would continue to have homebound instruction when he is unable to attend Jordan as per the recommendation from Dr. Harkins." R. 1489. The District stated that it "is ready, willing and able to provide homebound instruction if [Z.W.] is unable to attend school on campus." *Id*.

The District revised its annual ARD on November 17, 2017. R. 617-24. In response to the parents' request about placement at OFA, the District reiterated that it "can provide much more appropriate services in the least restrictive environment for [Z.W.]." R. 618. It explained that, due to the nature of autism, it was "important that [Z.W. have] nondisabled peer models to enhance his communication and social skills." *Id*. It stated that OFA lacked "any age-appropriate non-disabled peers" and lacked the ability for Z.W. "to generalize these skills." *Id*. It recognized correspondence from the parents dated November 11, 2017, that Dr. Harkins was "no longer recommending an abbreviated schedule with the combination of homebound instruction." *Id*. As of that date, Z.W. was "attending One for Autism on a full-time basis." *Id*. Given the new information and recommendation from Dr. Harkins, the committee recommended that Z.W. "attend a full day of school" with an increase in "additional goals and objectives." R. 619. The parents disagreed with the district recommendations and "stated they are withdrawing [Z.W.] effective November 17, 2017, and will be seeking district reimbursement for private school tuition." *Id*.

**B. Agreed Enrollment at Private Facility and Request for Continued Enrollment**

Through a negotiated settlement agreement of the parties, Z.W. attended One for Autism ("OFA") for the 2017-2018 and 2018-2019 school years. R. 572-74. Despite starting at OFA in October 2017, his first good month was February 2018. *See* R. 4172. And as of August 2018, his aggression had his parents looking for different options. *See* R. 3499.

On March 6, 2019, Circle of Care ("CoC") reevaluated the occupational therapy ("OT") needs of Z.W. because staff at OFA were "concerned about aggressive behavior, social skills, [and] fine [m]otor skills." R. 2318. At that time, the recorded criterion for discharge from OT was achieving "maximum functional benefit from therapy in progress or will no longer benefit from additional therapy." R. 2327. Just twelve days later, however, CoC discharged Z.W. from OT "due to aggressive behaviors." R. 644, 2330. Upon discharge, CoC noted that Z.W. would benefit from "ABA Therapy where [he] can receive 1-on-1 attention from an RBT [(registered behavior technician)] under a BCBA [(board certified behavior analyst)]." R. 2334.

On April 22, 2019, the parents provided notice to the District that they "intend[ed] to continue [Z.W.'s] enrollment at One for Autism, as he [wa]s making meaningful progress as a result of his attendance there, and [requested] that the District place [him] at One for Autism, or reimburse [them] for the cost of tuition and transportation in connection therewith." R. 3938; *accord* R. 2063-64. Among other things, the parents stated that "[h]is initial trial period was a resounding success, and [Z.W.] has continued to thrive at his new school," R. 3937, and he had "made more progress at One for Autism in 16 months than he did in almost 9 years' enrollment with the District," R. 3938. The District responded to that notice by (1) requesting to evaluate Z.W. with procedural safeguards, (2) providing a prior written notice of evaluation with an attached consent form, (3) seeking consent to allow District staff to visit with OFA staff and observe Z.W. at the private program, and (4) informing the parents that the District would need to schedule an ARDC

meeting because of the request for summer services, also known as extended school year ("ESY") services. R. 3391.

OFA provided a one-page report of Z.W.'s PLAAFPs as of May 2019. *See* R. 3518. At that point, he could "read various simple structured words," "identify all of the alphabet and numbers 1-100," "count to 20 without visuals or assistance," and "match letters to a corresponding picture with the correct beginning sound." *Id*. He also knew "his colors and shapes"; "demonstrate[d] correct pencil grip"; and could trace lines and shapes, "write his name with assistance," and independently "run, walk, jump, kneel, and hop." *Id*. But, with respect to reading and language arts, he "struggle[d] with reading complex sentences" and had "only worked on simple sight words." *Id*. As to math, he had "only worked on simple addition," "struggle[d] with 1:1 correspondence," and had difficulty "associating one tactile with one number." *Id*. He was also "unable to independently trace letters and numbers to completion." *Id*. His aptitudes for science and social studies were unknown. *Id*.

OFA recognized that Z.W.'s "behavior has been the main impact on his academics." *Id*. He had "been unable to perform at grade level" due to his aggression. *Id*. He "struggle[d] with his desires and wants," sometimes fixating on people or things. *Id*. This could "cause an outburst of aggressive behavior." *Id*. OFA concluded its one-page recitation of academic achievement and functional performance with: "If he develops a relationship with a staff member, he is more likely to behave for them. [Z.W.'s] academic performance will increase once his behavior is better managed." *Id*.

## C. ARDC Meetings Regarding ESY Services in 2019

On May 24, 2019, the District convened an ARDC meeting, which was reconvened on May 31 and June 12, 2019. *See* R. 570; 640-87 (complete record of ARDC and resulting IEP). The numerous attendees on May 24, 2019, included the parents and the Executive Director of OFA,

Olga Vasquez-Silva. R. 665-66. The purpose of the meeting was to discuss the student's program-

ming "at OFA and then to determine programming for extended school year services." R. 666.

Time permitting, the participants would discuss the "programming for next academic school year."

*Id*. The parents, however, were "not prepared to discuss placement for next [academic] year," and

wanted to discuss such placement after a complete evaluation. *Id*.

Ms. Vasquez-Silva stated that OFA provides Z.W. "therapy 3x-4x per week with a behav-

ior technician for one hour sessions"; and the parents privately fund OT "once per week for 30

min[ute] sessions" and speech therapy "two times per week for 30 minutes." *Id*. As of May 24,

2019, the District lacked sufficient information to propose summer services or to develop an ap-

propriate IEP. *See id*. "Although the district ha[d] previously requested data from OFA, it was just

provided at the beginning of th[e] meeting and the evaluators ha[d] not had time to review" it. *Id*.

It thus proposed continuing the meeting to the next week. R. 667. And, according to Ms. Vasquez-

Silva, OFA "agreed to help transition [Z.W.] back" to the District, it did not do so for unknown

reasons.[4] R. 4686.

On May 28, 2019, District staff, Leah Heeter (a licensed specialist in school psychology

("LSSP") and Dione McDowell (District Instructional Coach for Autism/Behavior) observed Z.W.

for approximately ninety minutes. R. 2440. This observation took place at OFA. R. 5103. During

this time, Z.W. exhibited various behavioral issues, including spitting, throwing items, shouting,

and banging his head. R. 2440. He had to be restrained. R. 5114. Ms. Vasquez-Silva recalled that

Z.W. had "a meltdown" and had to be restrained when the District came to observe him at OFA.

R. 4687.

The father and others attended the reconvened meeting on May 31, 2019, but no one

---

[4] While there was some confusion as to which ARDC meeting she attended, Ms. Vasquez-Silva clearly stated that she only attended the meeting where OFA agreed to assist with Z.W.'s transition. *See* R. 4686-88.

affiliated with OFA attended. *See* R. 667. The participants discussed objectives and goals for ESY and the 2019-2020 school year. *Id*. With the exception of the parent, the committee determined that ESY "services can be provided at a placement within the school district" and that the "goals and objectives could be implemented in the Adapted Learning Environment (ALE) class in Schertz for the 2019-2020 school year." *Id*. The father disagreed with the proposed placement location and "stated that he wants the school district to place [his son] at One for Autism or reimburse the parents for placing [the student] at One for Autism." R. 668. In light of the disagreement, the committee agreed to continue the meeting so that both sides could "gather additional data in order to reach an agreement." *Id*.

District staff again observed Z.W. at OFA on June 4 and 12, 2019. R. 2440, 5103. The first observation was limited to an outburst by Z.W. culminating with him throwing a CD player and his shoes, spitting, and being restrained by OFA staff. R. 2440, 5195-97. The next observation session fared better. *See* R. 2440-41. For about one hour, District staff conducted "a one-on-one behavioral therapy session" with five-minute breaks. R. 2440. Z.W. "appeared happy" during break times, "as he smiled, laughed, squealed in excitement, and made statements such as 'I'm so happy' or 'so cute.'" R. 2440-41. During this time, staff observed him working in "an environment with auditory distractions such as a loud air conditioner, noises coming from an adjoining room and a constant chirping sound coming from an electronic device such as a smoke detector." R. 2441. He was also "able to continue working when other students or staff members entered the room." *Id*. After the first hour, Z.W. initially transitioned easily to another room, but became upset that he was unable to bring some items from the prior room. *Id*. This resulted in him running "to the quiet room" where he was observed throwing items and spitting. *Id*.

The father again attended the reconvened meeting on June 12, 2019, without any representative from OFA. *See* R. 668. Kimberly Ferguson, Assistant Director of Special Education for

the District, also attended. *Id*. She first became involved with Z.W.'s educational program that month and the June meeting was the first she attended for him. R. 4542. She stated that OFA did not provide requested behavioral data. R. 4543. Nor did it ever provide a behavior intervention plan. R. 4545. The District's proposed program included a behavior intervention plan. R. 646. The District "proposed occupational therapy, speech therapy, transportation services, and behavioral support." R. 4545, *accord* R. 641-42 (noting that Z.W. was not currently "receiving Speech Services at One for Autism"); 644-45 (noting that Z.W. had been discharged from OT services at OFA); 646, 662-63, 665.

Despite various concerns expressed by the father, the committee, with the exception of the father, agreed to placement and schedule of services. *See* R. 669-72, 5200. The District discussed an autism supplement. R. 5200. It offered "in-home training" and "parent training," which the father declined. R. 5200-01. It asked to consult with the student's physician, but the parents did not give consent. R. 5201. It discussed the strategies to be used with Z.W. R. 5201-02. It discussed transitioning Z.W. from OFA back to the District. R. 5203. It wanted to make the transition "as predictable as possible"; it "had teachers develop transition books, social narratives to help calm him when he became frustrated"; and it discussed "creating a very structured environment" in addition to OFA staff coming to the District to assist as well as District staff going to OFA so that Z.W. "could build a rapport with the people that would be providing services." R. 5203-04. The committee recorded the combined results, recommendations, and discussions from the May-June meetings. *See* R. 640-87. Among other things, the ARDC meeting resulted in ESY services to be in effect from June 12, 2019, through June 11, 2020. R. 662. Nevertheless, an additional evaluation was needed before completion of a new FIE. *See* R. 665, 717.

**D. Subsequent Developments in 2019**

The family traveled to Europe for two weeks from "mid-June to late-June." R. 5066-67.

Z.W. attended OFA both before and after that vacation. R. 5066-68. Z.W. did not attend SCUCISD for ESY services. R. 5204. Nor were District staff allowed to go to OFA to build a rapport with Z.W. *Id.*

The parents commenced litigation in July 2019 while Z.W. was attending OFA. R. 5065; *see also* R. 2 (noting that the Texas Education Agency ("TEA") received the request for due process hearing on July 30, 2019, and an initial scheduling order was issued on August 1, 2019); R. 30 (Notice of Filing); R. 31-42 (Request for Due Process Hearing). By email dated August 13, 2019, the father sought medication changes from Z.W.'s treating physician, Dr. Harkins, because Z.W. had "had meltdowns 10 out of the last 14 days between 12:30-1:00 pm," which "are especially problematic at school." R. 3503.

From September 3 through 11, 2019, Z.W. was hospitalized at Clarity Child Guidance Center ("Clarity"). R. 2496. Severe aggressive behavior prompted the hospitalization. R. 2495. At that time, One For Autism "acknowledged that they could no longer manage him in the regular class environment" and he had become "virtually ungovernable at home." *Id.* His return to school lasted less than an hour before his behavior compelled his father to remove him. *Id.* After Ms. Vasquez-Silva called his father about the last outburst, Z.W. did not return. R. 4684. He did not attend OFA anymore because his "behaviors were just really intense." R. 4685.

On September 16, 2019, the father relayed additional information to Dr. Harkins. *See* R. 3505. At that time, Z.W. was experiencing "severe aggression" and the father was looking for an appropriate hospital to place him because the hospital that had released him a week earlier lacked an open bed for Z.W. *Id.* The father also informed the doctor that "they were not going to take [Z.W.] back to One for Autism . . . where his meltdown [had] began [that] morning" and they were looking for school recommendations from the doctor. *Id.* A medical report dated that same date notes worsening and uncontrolled aggression and anger outbursts by Z.W. R. 3506. Also on that

date, Z.W. was hospitalized for a second time at Clarity, until September 26, 2019. R. 2496. Upon discharge, Clarity noted that "ABA therapy arranged at school." R. 2101. It instructed: Z.W. "will discharge home and follow-up with Dr. Harkins, One for Autism, and Empower [Behavioral Health ("Empower")] (for intensive ABA therapy in home and at school)." *Id.*

A due process hearing was initially set for October 1, 2019, but was reset for mid-February 2020. R. 3. Two days later, Empower conducted its initial evaluation and set an initial treatment plan to commence on October 23, 2019. R. 2405. It noted that the parents' "main concerns" were Z.W.'s "severe aggression and difficulties with transitioning." R. 2406. It further noted:

> Unfortunately, skill acquisition is limited because his aggressive and disruptive behaviors interfere with learning. In addition to behavior reduction, [the] parents have indicated that they would like assistance with increasing independence for adaptive skills such as hygiene (e.g., showering), doing laundry, washing dishes, meal preparation, fine motor skills ; and increasing functional communication. Receiving full-time ABA services is the last attempt for [them] before they consider placing [Z.W.] in a residential setting.

*Id.*

By letter dated October 9, 2019, Dr. Harkins sent a letter of medical necessity to Blue-Cross/BlueShield stating that Z.W. must "receive 40 hours a week of ABA therapy . . . with 2 technicians due to his aggression." R. 3511. At that time, the doctor indicated that "[a]ll medical options ha[d] been exhausted, including hospitalization, prescription medications, and medical marijuana under the compassionate care act." *Id.* The doctor opined that "ABA therapy is the most likely treatment to have a positive effect" and that absent "such full time ABA therapy, placement at a residential treatment center will be the only other option." *Id.* Z.W. "was unable to attend One for Autism during the months of September and October due to his aggressive behavior." R. 2462.

District staff evaluated Z.W.'s speech and language skills on October 14, 2019. R. at 2441. With three five-minute breaks, Z.W. participated in the assessment for approximately thirty minutes. *Id.* "He became briefly agitated when told that he could not have a screw driver, but

15

accepted this response without further incidence." *Id*. During the third break, he exhibited aggressive behavior, becoming calmed "by his father when he told [Z.W.] that testing would be discontinued." *Id*.

The next day, an occupational therapist was unable to evaluate Z.W. "at the Marion Dolford Learning Center" due to a "parent request" to reschedule due to behavior. R. 2427. This evaluation went "very poorly," not even "able to start" formally. R. 5034. It ended when staff greeting Z.W. in the parking lot resulted in aggressive behavior, such as spitting and throwing shoes. R. 5037. A rescheduled evaluation for October 18, 2019, was also not completed on parent request due to behavior. R. 2427, 5039-41. The parent also "requested no further rescheduling." R. 2427.

At some point in October 2019, after Z.W. had left OFA, his father indicated that his son would transition to the District. R. 4329. But Z.W. did not appear as planned, possibly due to another hospitalization at Clarity. R. 4330, 4370.

Z.W. was again hospitalized at Clarity from October 20 to 27, 2019. R. 2496. During this hospitalization, SpringBrook Behavioral Health ("SpringBrook") "had an unexpected opening in one of their units" that permitted Z.W. to transfer there "for full-time inpatient/residential care." *Id*. It was noted that: "It is anticipated that [Z.W.] will continue to require residential placement in connection with any future 'step-down' or discharge from SpringBrook, in order to be assured that his aggressive behavior has fully abated." *Id*.

SpringBrook admitted Z.W. on October 28, 2019, because he was (1) "at immediate risk of psychiatric hospitalization"; (2) a threat to himself or others; (3) unable to "be successfully maintained in a less restrictive setting," and (4) engaging in persistent behavior despite "documented interventions." R. 1553. Despite these reasons for admission, SpringBrook did not draft a BIP for Z.W. until April 2020, and Kevin Loeb, BCBA at SpringBrook, did not recall receiving one from OFA upon admission. R. 4937. Upon Z.W.'s admission, Dr. William M. Fisher began

treating him. R. 1553, 3879. Springbrook is located in South Carolina. R. 2633, 3253, 4784. It "is the highest level facility . . . a locked facility with . . . a very restrictive and controlled environment." R. 4797. It offers "a holistic approach to treating children with autism and concurring disorders." R. 4784. It has "a very integrated mult-disciplinary team of occupational therapists, recreational therapists, mental health therapists, BCBAs, dieticians . . . a wide variety of services to work with children that may have severe behaviors that have kind of removed them from their normal environment." *Id*. It has an educational component provided by Einstein Academy with a student-teacher ratio of one to ten. R. 4785. When a "student comes with an IEP," SpringBrook "incorporate[s] that into the treatment." R. 4789. The ultimate goal is "to decrease the intensity of behaviors that they have come in with" and to "provide them the skills necessary to transition to a less restrictive environment." R. 4790. Dr. Harkins considered placement at SpringBrook as "hospitalization." R. 4399-400.

On special request of the ARDC, the District reevaluated Z.W., completing the process on November 5, 2019. R. 3335. At that point, the District had a new FIE for him. *See* R. 2460, 3335. The newly completed FIE would remain in effect through November 4, 2022. *See* R. 690. Participants of the multidisciplinary team consisted of two LSSPs, an occupational therapist, a speech language pathologist, and a physical therapist. R. 3376. LSSP Heeter emailed the parents a copy of the reevaluation on November 12, 2019, informing them to contact her if they had questions or concerns. R. 3469. She received no response from the parents. R. 4315.

Given the reevaluation and its new FIE, the District convened another ARDC meeting on November 19, 2019. R. 717-18. Based on the reevaluation, Z.W. continued to be eligible for special education services as a student with Autism, Speech Impairment, and OHI (other health impairment), while also qualifying for special education services as a student with an Intellectual Disability ("ID"). R. 718. The father attended and expressed concerns, objections, and

disagreements. R. 717-19. He disagreed with placement at the school district and sought "reimbursement for the residential facility and One for Autism and his transportation to and from the facility and incidentals." R. 719. Following the meeting, he stated that he and his wife "would like to reconvene after district staff have observed [Z.W.] at his current residential facility." *Id*. The committee recorded the results, recommendations, and discussions from the November meeting. *See* R. 690-741.

The District recommended that ID eligibility be added based upon testing showing Z.W.'s overall IQ was 48. R. 718. The father reserved his right to comment on the addition at a later time. *Id*. The District recommended OT and speech therapy but determined that Z.W. did not qualify for physical therapy. *Id*. The District reviewed the results of its Functional Behavioral Assessment ("FBA"), stated that a BIP remained appropriate, but wanted to update the FBA once Z.W. began attending school. R. 719. With the exception of the father, the ARD committee agreed that the District could meet all of Z.W.'s educational needs and provide him with a free appropriate education in the least restrictive environment at SCUCISD. *Id*. The father indicated that Z.W. was "receiving 16 hours of academics in a seven-day week at [SpringBrook]." *Id*. He disagreed "with placement at the school district" and stated that he was seeking incidentals, reimbursement for the residential facility and OFA, and his transportation to and from both. *Id*. The District offered the father a ten-day recess, to which he indicated that he would "get back with the district." *Id*.

After the ARD, the father emailed "that he and his wife disagree with adding the eligibility category of intellectual disability," they wanted "to wait to reconvene after district staff have observed [their son] at his current residential facility." *Id*.; *accord* R. 3475. Via email, the District clarified that Z.W.'s "primary eligibility would remain autism, with a secondary intellectual disability." R. 3474. The father responded by email:

> Although I heard you say at least twice "in my professional opinion", I don't see that you are qualified to render a diagnosis. No evidence exists that suggests [our

son's] autism and related anxiety is not at the root of the challenges that he is facing. Moreover, no data exists that indicates that a change in the classification is warranted, and you have not articulated the denial of any service if he is not classified as eligible due to intellectual disability. We disagree with the proposed classification for eligibility of "intellectual disability" and request that the classification of "Autism" as the sole and primary source of eligibility remain. There is simply no reason to include "intellectual disability" at this time and we are deeply suspicious of the district's motives for proposing it, especially when we are in the middle of litigation- is the district using the ARD as a pretext for reclassifying [our son in] a manner that will be favorable to the district?

*Id*.

On November 30, 2019, SpringBrook created an Individualized Service Plan ("ISP") for Z.W. *See* R. 2651-58. SpringBrook uses ISPs because it is "not allowed to produce IEPs." R. 4802. At that time, Z.W. enrolled at Einstein Academy at SpringBrook. R. 2651. Services provided weekly for a normal school year consisted of 150 minutes each for reading/English language arts and writing and 300 minutes each for math and specialized instruction for behavior. R. 2657. This amounts to ten total hours of academics. R. 4802-03. And "even of those hours," Z.W. did not always participate due to his behavior. R. 4803.

In December 2019, Dr. Fisher conducted a Mental Status Exam and set out his Current Behavioral Observations regarding Z.W. *See* R. 2491-93. In conjunction with that process, he also set out the relevant background and developmental information regarding Z.W., including relevant hospitalizations. *See* R. 2494-96.

**E. 2020 Developments**

Despite his prior email and the reservations stated therein, the father requested an assessment by Intellectual and Developmental Disabilities Services ("IDDS") from Alamo Area Council of Governments ("AACOG") to determine whether Z.W. "meets the eligibility criteria for Priority Population services as specified by the Texas Department of Aging and Disability Services." R. 2629. On January 6, 2020, IDDS conducted a diagnostic interview and a psychometric assessment. *Id*. With respect to intellectual functioning, a November 21, 2019 Greenville Assessment and

Learning Specialists Psychological Assessment Report showed an IQ of 47, while the District's November 5, 2019 report showed an IQ of 48. R. 2631-32. IDDS accepted the current report and found the "scores are consistent with Intellectual Disability." R. 2632. It concluded that Z.W. met "the diagnostic criteria for Intellectual Disability" and found him "eligible for available and appropriate Priority Population services." R. 2633.

District personnel visited SpringBrook on January 28, 2020. R. 3253, 5204. Although the District asked to observe Z.W. "for two days in his classroom environment," it was allowed one hour for observation in an apparent non-classroom setting. R. 5204-05. It observed about fifteen students "participating in a musical chairs activity." R. 5205. It observed no use of ABA strategies, visual supports, or calendars. *Id.* The room did not appear "structured in any way." *Id.* It observed a staff member tickling Z.W. when he got frustrated with another student and told him to shut up. R. 5206. The tickling was concerning because it seemed to be "a preferred activity" or "reinforcer" for Z.W., but used in the manner observed, it "reinforced the behavior of telling his peer to shut up." *Id.* During the observation period, SpringBrook staff never "discussed appropriate behavior or replacement behaviors" for Z.W. *Id.* Staff interacted with Z.W. verbally. *Id.* No one at SpringBrook indicated that they had a BIP or that they had gotten one from OFA. *Id.*

District staff met with SpringBrook staff for "less than an hour." R. 5207. A BCBA oversees the SpringBrook program. R. 3233. The BCBA, Kevin Loeb, "shared that when [Z.W.] arrived there he was able to write his name, but that he had significantly regressed and was not even able to write his name at that point anymore." R. 5207. He indicated that SpringBrook was not educationally focused. R. 3253, 5207. Its focus was "on what [wa]s happening at the home," R. 3253, and medical or medication management, R. 5207. It did "very minimal educational things and [Z.W.] ha[d] regressed educationally on his goals and objectives." R. 3253. It "stated that the mother appear[ed] to be a trigger for [Z.W.'s] behavior." *Id.* It felt she was a trigger "due to her

anxiety about" her son. R. 3233. It believed that the District could provide an education for Z.W. R. 5207-08. The District team "recommended a plan to transition [Z.W.] back to school with additional support." R. 3233.

In February 2020, the parents filed an amended request for a due process hearing related to their son's individualized education program for the 2019-2020 school year. R. 2, 140-56. That amendment initially resulted in rescheduling the due process hearing to April 2020, but in March the hearing was reset to June 2020 "to accommodate the parties participating in mediation." R. 3.

The parties participated in an informal resolution session on March 4, 2020. R. 2. And, on that same date, the District held an ARDC meeting to review the disputed IEP. R. 3225-75. The father participated by phone. R. 3253. Z.W. still met the criteria for a need for special education and related services through his autism, speech impairment, intellectual disability, and other health impairment. R. 3225. Because Z.W. was at a residential facility and had "not attended public school in several years," the ARD committee revised the transition plan to increase the amount of support upon his return to SCUCISD. R. 3266. Although the District "offered a parent training assessment," the father declined "at this time." R. 3253. The father "stated that home is the concern and that [his son was] getting more education at the facility than if he was just at home." *Id*. He believed that his son needed "to be residentially placed and want[ed] to place him at a residential facility in Texas." R. 3254. "The ARD ended in disagreement." *Id*.

SpringBrook drafted its first BIP for Z.W. in April 2020. R. 4937. Because the BIP is "always subject to being changed and revised based on new information," the plan is "never a really completed document," and SpringBrook did not draft any other BIP for Z.W. R. 4938.

On June 11, 2020, Z.W.'s case was reassigned to a different hearing officer, resulting in rescheduling the due process hearing to September 29, 2020, with a pre-hearing conference set for September 4, 2020. R. 3.

From June 26 through October 20, 2020, SpringBrook placed Z.W. in seclusion twenty-two times and injected him with Haldol four times. R. 4822, 4826. In this context, seclusion means being "locked in a room" alone. R. 5209. This number of seclusions was a reduction from prior months. R. 4826-27.

While Z.W. resided at Springbrook, a Psychiatric Residential Treatment Facility ("PRTF") Interdisciplinary Team conducted periodic reviews to reformulate his plan of care. *See*, *e.g.*, R. 1643. On September 3, 2020, the team provided five rationales for Z.W. continuing his stay in the PRTF: (1) "Need for continued active psychiatric treatment by a multidisciplinary team"; (2) "Client is danger to self or others"; (3) "Client continues to exhibit acute behavior, mood or thinking disturbance"; (4) "Physical/Mechanical restraint or Seclusion is necessary"; and (5) "Inability to maintain psychiatric hospital service level of functioning on trial visit outside of the psychiatric hospital." *Id*. None of these stated rationales involve education.

At the prehearing conference of September 4, 2020, the parties jointly requested to reschedule the due process hearing for "less than a month" because they had discovery to resolve. R. 3. On September 10, 2020, the District emailed a representative of the family to notify them that the District was "seeking to schedule an ARD for Z.W. on September 30th at 1:40 pm" and expressed hope that the representative or client "would be available for this ARD." R. 3117. The representative's response (1) pointed out that, "once a due process has been filed, the mechanism for resolving any dispute is through a resolution session or mediation," (2) stated that her "clients have attended numerous unsuccessful ARDS since filing of their request for hearing and have no reasonable expectation now that his ARDC will be successful otherwise," and (3) requested that the ARD "be postponed until the conclusion of [the due process] hearing." R. 3116. The next day, the Hearing Officer set the due process hearing for October 26, 2020, with the agreement of the parties. R. 3. The day after that the father again requested to postpone the ARD to after the due process

hearing and expressly declined to give the District permission to proceed with the ARD on the date or time requested. R. 3116.

On September 17, 2020, the District informed the parents that, because Z.W.'s current "IEP was for the 2019-2020 school year," it needed "to hold an ARD meeting for [his] 2020-2021 programing." R. 3115. While it expressed a desire for both parents to attend the ARD, it stated that the "meeting will need to go forward . . . [on] September 30, 2020, at 1:40." *Id*. That same day, the father asked: "So, you are not even able to postpone the meeting by a month?" *Id*. And, on September 28, 2020, the father reiterated his request for a postponement and continued to object to holding the ARD on September 30, 2020. *Id*.

On September 30, 2020, the District held an ARDC meeting and formulated an IEP for Z.W. *See* R. 3278-3334. At that point, Z.W. had "not attended" school in the District "for the past two years." R. 3279. To the District's knowledge, he was still at SpringBrook, but the parents had not provided "updated data information" despite being requested. *Id*. The District thus lacked current data or information for reading, speech related services, OT, writing, math, behavior, science, and social studies. *See* R. 3279, 3282-83, 3285. The District recognized that Z.W. had "turned 14 in December 2019," and stated that it would complete or add a "transition evaluation and supplement and any appropriate transition-related goals . . . once SCUC staff are able to work with [Z.W.] and/or parents to get the needed information." R. 3285. It noted:

> There were more than three attempts made to schedule to [sic] ARD to accommodate parent participation. Parents chose not to attend. Due to the fact that [Z.W.'s] annual ARD meeting for this school year is due, the parents were informed that the ARD meeting would need to occur and they were encouraged to attend.

R. 3317. It further noted that the "[p]arents declined to participate in ARD meeting" and that they "continue to request residential placement." R. 3278.

To formulate an IEP for the 2020-2021 school year, the District utilized the "school evaluation completed in 2019 and information from One for Autism that was provided in 2019." R.

3279. It also considered January 2020 information from SpringBrook. R. 3285. Based on that information, it noted that SpringBrook "does very minimal academics," and that Z.W. had "regressed academically since" going there. *Id*. An example of regression was that he "can no longer write his name" despite arriving at the facility with that ability. *Id*.

The District considered and recognized a number of matters shared or recommended by the BCBA who oversaw the SpringBrook program. R. 3285-86. A recommendation that Z.W. have "1:1 support when transitioning back to district" was reflected in the District's "schedule of services with full-day dedicated behavior support, as well as the BIP transition plan and the [autism] supplement." R. 3285. The BCBA shared that SpringBrook's focus was "on parent training and working with the family, particularly [the] mother, whom they fe[lt was] a trigger for [Z.W.]." R. 3285-86. "The director of the program shared that education is not the focus" and that the focus for Z.W. "at SpringBrook [was] leveling and managing medication and working with parents." R. 3286. The "team lead" from SpringBrook shared that "their primary concern is medication and the home environment," and that the District "could definitely" meet Z.W.'s "educational needs." *Id*.

With respect to transitional services, the District recorded that it first discussed such services on September 30, 2020. R. 3286. Although the District invited the student to the meeting, he was not present because the parents "declined to attend annual ARD meeting." *Id*. It further noted that Z.W. had "not been in public school" and to its knowledge he was at SpringBrook. *Id*. It stated that it would complete a transition supplement "as soon as" it was "able to work with student and/or parents to gather needed information." *Id*.

While at SpringBrook the week of September 20 through 25, 2020, Z.W. "made some improvements," by "attend[ing] more class than previous recording periods," and "working on learning/writing his numbers" and letters. R. 3882. However, he attended class only one day the next week. R. 3881. And for the week of October 26 through 30, 2020, Z.W. "refused class every day

except" one and had "multiple meltdowns during" education." R. 3879.

Z.W. filed a new request for due process hearing on October 22, 2020, "and eventually, the parties agreed to a consolidation of the cases, and requested a continuance of the due process hearing." R. 3. The hearing office issued an order of consolidation on October 26, 2020, and set a consolidated due process hearing for December 2, 3, 4, 14, and 17, 2020. *Id.*

SpringBrook discharged Z.W. the weekend of November 22, 2020, with a recommendation that he go to a "step down facility around a level three." R. 4797. It recommended a step-down facility, because his number of restraints and seclusions had reduced, as well as the duration of seclusions. R. 4825-27. A step-down facility "would be somewhere that perhaps is not a locked facility, less restrictive environment, lower staff ratio" that "still provid[ed] intensive services." R. 4797. Z.W. needed a step-down facility because he remained "a danger to self or others if returned home." R. 4798. According to Alissa Wilmerdinger, a mental health therapist from SpringBrook, Z.W. "would not be successful" at "public school at this point," i.e., as of her December 4, 2020 testimony. *Id.* Z.W. had been accepted at Avondale, a step-down residential facility. *Id.*

Upon Z.W.'s discharge, his father picked him up from SpringBrook and transported him to Houston so that he could go to Avondale. R. 5079. And as of the date of the father's testimony on December 4, 2020, Z.W. had been quarantined at Avondale since his arrival on November 23, 2020. R. 5080. Although Z.W. could interact with staff and a house mate, he would not start school until quarantine was to end as scheduled on December 7, 2020. R. 5081.

SEHO Kimberlee Kovach conducted a due process hearing on December 2, 3, 4, 14, and 17, 2020. R. 4; *see also*, R. 4070-4384 (Dec. 2); R. 4385-4768 (Dec. 3); R. 4769-5090 (Dec. 4); R. 5091-5404 (Dec. 14); R. 5405-5546 (Dec. 17). At the time of the hearing, the parents had participated in three informal resolution sessions, one mediation, and since the summer of 2019, about five or six ARDC meetings. R. 4529.

**F. Testimony from December 2020 Due Process Hearing**

Over the five-day hearing, the SEHO heard testimony from numerous witnesses. The Court herein highlights some of the most relevant testimony that has not otherwise been noted in the above chronology of events.

**1. <u>District Staff</u>**

Ms. Gooch, a Special Education Teacher of the District, testified that, when Z.W. returned to the District, he had regressed during his time at One for Autism. R. 5267. From her testimony, it is clear that she was comparing his abilities when he left the District to those set out in the one-page report from OFA. *Compare* R. 3518 *with* R. 5267. She stated that he had regressed "[b]ecause like with the math, they [(OFA)] said he could only rote count up to 20," he was only doing "simple addition," he "struggled with one-to-one correspondence," he "only knew simple sight words," and "he was not doing his writing either." *Id*. He was only doing "hand-over-hand" writing. *Id*.

Ms. Gooch also testified that Z.W. had experienced significant regression at SpringBrook as to when she "had him in December of 2016." R. 5268. She said he "was back to when [she] got him in kinder[garten] if not lower than that." *Id*. He lacked "the skills that he had when [she] first started teaching him." *Id*. This corresponds positively with the results of the November 5, 2019 reevaluation and resulting FIE which also showed that Z.W. had regressed educationally since leaving SCUCISD. R. 718, 3335-84.

Although records from SpringBrook show that Z.W. "was locked in a room over 22 times and he was also medically sedated by injections," R. 5268, Ms. Gooch testified that she "never saw anything that would even warrant that," R. 5269. In her professional opinion, Z.W. should be placed in the District with the IEPs developed for him for the 2019-2020 and 2020-2021 school years. R. 5269-70. She testified that under the District programs, the public school system could provide all services that he needs, including academics, behaviors, communication, speech, and

sensory. R. 5270.

Dione McDowell, the District's Instructional Coach for Autism/Behavior, also testified. *See* R. 5095-250. At the time of the December 14, 2020 hearing, she was a fifteen-year employee of the District who was then employed as "behavior specialist, autism specialist and coordinator." R. 5097. Although she was neither a licensed behavior analyst nor a certified registered behavioral technician, the District employed two BCBAS and at least two RBTs. R. 5097-98. The BCBAs were hired as classroom teachers rather than providing direct ABA therapy as a related service to students within the District. R. 5107.

Ms. McDowell was highly qualified to teach special education classes from kindergarten through Twelfth Grade. R. 5099. She knew Z.W. and agreed that he was "not a new student to [the] district." R. 5100. She testified that the District had observed Z.W. at One for Autism in May-June 2019, and at SpringBrook in January 2020. *Id*. The District also met with staff of Spring-Brook, reviewed minimal records provided by OFA, and reviewed various records of SpringBrook, including medical notes, records indicating that Z.W. would be placed in isolation or seclusion, and educational notes, but not a BIP. R. 5101-02, 5209-10.

Ms. McDowell agreed "that ABA is a research-based practice that has been proven to be effective with students with autism." R. 5105. Its "purpose is to change behavior of social signifi-cance." *Id*. There are multiple ABA strategies, but a general focus "is to create replacement be-haviors for inappropriate behaviors." *Id*. She was not aware whether Z.W. received direct ABA therapy while at OFA or SpringBrook. R. 5106.

Ms. McDowell reviewed "doctor's notes about when [Z.W.] was put in seclusion and med-icated with Haldol." R. 5209. When asked whether the District would ever put Z.W. in seclusion, she responded: "Absolutely not." *Id*. She stated that it is "illegal and it's not right for students" because "there's no way to keep him safe if he's in a locked room." R. 5209-10. She testified that

Z.W. "had significantly regressed" during the eighteen months with OFA after leaving the District. R. 5212-13. And "he regressed even more" while at SpringBrook. R. 5213.

Kimberly Ferguson, the Director of Special Education for the District, also testified at the hearing. R. 4456-4612. She compared the information from when Z.W. was at OFA with the time he was last with the district and found "very substantial behavioral and academic regression." R. 4577. While with the District, Z.W. "was working at about a beginning first grade level," whereas at OFA "it was more beginning of kinder level." R. 4578. She testified that the District had never restrained Z.W., but OFA used restraint "often . . . and for reasons we would not ever restrain a student." R. 4578-79. She further testified that Z.W. "[c]ontinued to regress substantially" when he left OFA for SpringBrook. R. 4580. While at SpringBrook, Z.W. "regress[ed] back to really a foundational pre-k, like prerequisite pre-k level." *Id.*

### 2. **Retained Expert of the District**

The District retained an expert, Dr. Heather Hughes, to review its IEPs and BIPs and provide testimony. The SEHO relied upon her testimony on two occasions. *See* R. 14-15 & nn. 71 (citing T. 1441-1442 (found at R. 5510-11)) and 79 (citing T. 1353-1354 (found at R. 5422-23)).

Dr. Hughes testified that "[t]here was a regression of skills" while Z.W. was at OFA and "significant regression" while at SpringBrook. R. 5509. She described the latter regression as "profound" when compared to Z.W.'s performance at the District while stating that he had "notable regression" even from OFA to SpringBrook. R. 5445. In her professional opinion, the program at SpringBrook was "ineffective" and "detrimental" and that Z.W. should be "attending his neighborhood school in an environment that can meet all of his . . . educational and behavioral needs with a multi-disciplinary team." R. 5445-46. An ALE class is appropriate for him and provides "the necessary components to implement an IEP effectively for him." R. 5446. In her professional opinion, the developed IEPs for the 2019-2020 and 2020-2021 school years are "appropriate based

28

upon the data that the school personnel had available to them for drafting the IEP." *Id*. She viewed IEPs as "dynamic document[s]" that provide an opportunity for students to transition to a school setting while recognizing that additional data may "inform any needed revisions." *Id*.

As to the initial testimony relied upon by the SEHO, Dr. Hughes testified that in-home and parent training is "really essential" to not reinforcing maladaptive or negative behavior if a parent is "engaging in those behaviors." R. 5510. She also testified that District staff "are trained and experienced enough to provide the services that [Z.W.] needs" and that "the classroom is structured to address [his] needs." R. 5511.

Through the later testimony relied upon by the SEHO, Dr. Hughes testified that the District's IEP and BIP "reflects all the required components of a behavior intervention plan and that it would be appropriate as an interim plan to help him transition back into the school setting." R. 5422. She also testified that it was "a great strategy" to increase "staff to three-to-one for the initial three weeks of [Z.W.'s] transition back to SCUC," because one "would anticipate that the transition period from a non-instructional environment to a school setting will require increased supports." *Id*. She further testified that having "a quiet location to perhaps de-escalate or . . . to utilize self-calming strategies if overstimulated" is "a great component to an instructional program," such as the IEP developed by the District. R. 5423.

### 3. **OFA Staff**

Olga Vasquez-Silva, Executive Director of OFA, also testified. While confused as to whether she attended the May 2019 or November 2019 ARDC meeting, Ms. Vasquez-Silva clearly did not agree that transitioning Z.W. back to the District "would be an appropriate step" when he ultimately left OFA, because, at that point, he "was so aggressive" that "he needed 24-hour care." *See* R. 4686, 4688. She also testified that, if she had to pick a couple of things to help Z.W. better access his related services and academics, her primary focus would be controlling and decreasing

his intense and dangerous behaviors. R. 4693. That would "definitely help him in the educational programming part of it." *Id*. As to whether the District or any public school would be able to do that, she opined that, when Z.W. left OFA "his behaviors were really intense," and "sometimes when the kids get to that point, [OFA is] not an option." *Id*. Another option would be a facility with "24-hour care for behaviors." *Id*. She clarified that she was "not saying the school district is not capable of it, but in [her] experience when kids get to that point, [OFA] is not an option." R. 4694. At that point, "[s]omebody else is an option." *Id*.

### 4. SpringBrook Staff

Alissa Wilmerdinger, Mental Health Therapist at SpringBrook, testified that Einstein Academy provides the educational component for SpringBrook with a one teacher per ten student ratio and an academic setting of about twenty hours per week. R. 4785. She testified that, when a student comes with an IEP, SpringBrook will incorporate the IEP into the treatment. R. 4789. According to her, "the ultimate goal for children who are placed at SpringBrook" is "to decrease the intensity of behaviors that they have come in with [a]nd provide them the skills necessary to transition to a less restrictive environment." R. 4790. His goals as to behaviors was to "reduce the intensity, frequency and duration." R. 4855-56.

Ms. Wilmerdinger disagreed that Z.W. had regressed because they had "been able to reduce the intensity, frequency and duration of [Z.W.'s] aggressive behaviors and reduce his symptoms of anxiety," thus allowing "him to function more in a classroom setting." R. 4796. This explanation, however, ignores educational regression and does not compare Z.W.'s educational abilities with those he had exhibited while at the District years before. She agreed that behaviors were his greatest impediment to accessing education. R. 4797. For him, it was "really dependent on the training and the expertise of the people in the school." *Id*.

When Kevin Loeb, BCBA at SpringBrook, testified on December 4, 2020, he did not think

that Z.W. was "ready at this point to return home" even though that is always the goal of Spring-Brook. R. 4902-03. At that time, he viewed Z.W. as needing "24 hour supervision." R. 4903. He was aware that Z.W. was then currently at Avondale. *Id*. He testified that, if one "could get better control of [Z.W.'s] attentional issues" and behaviors, he would absolutely be able to access more academics. R. 4906. When asked whether he believed "that a public school who has special education teachers working with [him] in a . . . special ed setting would . . . be sufficient for [Z.W.] to access his education given his attentional and behavioral challenge[s] at this point," he stated that it would be "very hard to say because schools are different everywhere." R. 4907.

Mr. Loeb later testified as to what is appropriate for Z.W. "right now." R. 4934. He thought that what was appropriate was what was "going on right now," being "moved to a lower level care that was closer to home, but it has a structured residential and a structured educational environment." R. 4935. When directly asked whether the mother appearing to be a trigger for Z.W.'s behavior, he first noted that he "was not able to witness [Z.W.] with his mom on very many occasions" and then stated that from what he had seen he did not "think that his mom is any more of a trigger than anyone else could potentially be." R. 4894.

### 5. Doctor Harkins

Dr. Harkins testified that she recommended residential treatment because Z.W. "couldn't function at school, and unless the father was there, he couldn't function at home." R. 4400. Z.W. "was getting more and more aggressive." *Id*. His biggest problem with accessing education even in a special education classroom was his aggression. R. 4401. There are problems with transitions and demanding hygiene. *Id*. His primary barrier to accessing education in a residential placement was his behavior, communication, and intelligence. *Id*. Unless one can get his behaviors under control, it would be difficult for Z.W. to go anywhere, and even a homebound environment presents safety issues for the homebound teacher. R. 4401-02. Going forward, his educational

31

programming should focus on life skills in an environment that is safe for the those working with him. R. 4402. As of the December 3, 2020 due process hearing, Dr. Harkins did "not know that [the District has] any program that could really be appropriate for [Z.W.]." *Id*. She did not know if "any school district" would. R. 4403. She thought "residential placement is necessary for" Z.W. *Id*. But even a residential placement would need to control his behavior. *Id*.

Dr. Harkins testified that Z.W. "needs an extremely structured environment" and one "cannot be that structured in a typical home setting." R. 4436. She further testified that the District was not providing such an environment "when the parents had to pull [Z.W.] out." *Id*. As of December 3, 2020, she did not "see how anything short of a residential placement . . . would allow him to benefit from an educational placement." *Id*. Even "the transition from wherever he lives to the school and back again" was "very difficult for him." *Id*.

Notably, when Dr. Harkins recommended residential placement, Z.W. was not at OFA. R. 4439. Her recommendation was based on what was occurring at home. R. 4438-39. Her recommendation was from a "medical perspective." R. 4439. Her knowledge of the District and Z.W. were based on events in 2015. R. 4440. Nevertheless, as of that hearing date, she believed that "residential placement [was] necessary for [Z.W.] to make behavioral and thus academic . . . progress." R. 4450 .

## G. Due Process Challenge

As reflected in the above background, Z.W. requested a due process hearing with respect to his 2019-2020 and 2020-2021 school years. *See also* R. 4. Primarily, Z.W. sought "reimbursement from the District for the parents' prior unilateral placement at One for Autism, and then subsequent unilateral residential placement at Springbrook Autism Behavioral Health." R. 5. The Hearing Officer also viewed Z.W. as requesting that his placement "at Avondale House in Houston, Texas [be] at District or public expense, along with reimbursement of prior and future

expenses, such as travel expenses, associated with such placements." *Id*.

The parties understood that the due process challenge only concerned the two mentioned school years. *Id*. Although the parties provided testimony and exhibits related to prior school years, they agreed that any discussion is for "context of background and basis for understanding the events preceding this matter." *Id*.

## H. Decision of Hearing Officer and Appeal

The Hearing Officer issued her decision on April 12, 2021. *See* R. 1-25. She noted two primary issues: (1) whether the District provided Z.W. with a free appropriate public education "FAPE," or stated more specifically, whether the proposed program and placement for Z.W. was reasonably calculated to provide Z.W. with required educational and non-educational benefits, or whether Z.W. required private placement in order to receive educational benefit; and (2) if private placement was warranted, then whether the proposed placement was appropriate. *Id*. at 1.

After taking testimony and evidence, the Hearing Officer determined that the District was able to provide a FAPE for Z.W., it was thus unnecessary to address the appropriateness of unilateral placements, and there was no entitlement to reimbursement for private placements. *See* R. 1-25. Z.W., through his parents, now appeals the special due process hearing.

## II. IDEA

"The Individuals with Disabilities Education Act (IDEA or Act) offers States federal funds to assist in educating children with disabilities." *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 580 U.S. 386, 390 (2017). When a State accepts the offer of funds, it "pledges to comply with a number of statutory conditions," including providing "a free appropriate public education—a FAPE, for short—to all eligible children." *Id*. (citing 20 U.S.C. § 1412(a)(1)). The IDEA defines FAPE as "special education and related services" satisfying four requirements:

> (A) have been provided at public expense, under public supervision and direction, and without charge;

(B) meet the standards of the State educational agency;

(C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and

(D) are provided in conformity with the individualized education program required under [20 U.S.C. § 1414(d)].

20 U.S.C. § 1401(9). As defined by the IDEA, "'special education' means specially designed instruction, at no cost to parents, to meet the unique needs of a child with a disability, including (A) instruction conducted in the classroom, in the home, in hospitals and institutions, and in other settings; and (B) instruction in physical education." *Id*. § 1401(29) (altered paragraph structure).

States "covered by the IDEA must provide a disabled child with such special education and related services 'in conformity with the [child's] individualized education program,' or IEP." *Endrew F.*, 580 U.S. at 390-91 (citing § 1401(9)(D)). The "centerpiece of the statute's education delivery system for disabled children" is the IEP. *Id*. at 391 (quoting *Honig v. Doe*, 484 U.S. 305, 311 (1988)). As a "comprehensive plan prepared by a child's 'IEP Team' (which includes teachers, school officials, and the child's parents), an IEP must be drafted in compliance with a detailed set of procedures." *Id*. (citing § 1414(d)(1)(B)). Through the IEP, the school district tailors the "special education and related services . . . 'to the unique needs' of a particular child." *Id*. (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 181 (1982)). Furthermore, an IEP

> must assure that, to the maximum extent appropriate, States will mainstream disabled children, i.e., that they will educate them with children who are not disabled, and that they will segregate or otherwise remove such children from the regular classroom setting only when the nature or severity of the handicap is such that education in regular classes cannot be achieved satisfactorily.

*Honig*, 484 U.S. at 311 (citation, internal quotation marks, and ellipses omitted); *accord* 20 U.S.C. § 1412(a)(5); *Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036, 1045 (5th Cir. 1989). When the IDEA speaks in terms of "Educational placement," it means the "educational program—not the particular institution where that program is implemented." *White ex rel. White v. Ascension Par.*

*Sch. Bd.*, 343 F.3d 373, 379 (5th Cir. 2003).

Although educators and parents "often agree about what a child's IEP should contain," they also disagree at times. *Endrew F.*, 580 U.S. at 391.

> When disagreement arises, parents may turn to dispute resolution procedures established by the IDEA. The parties may resolve their differences informally, through a "[p]reliminary meeting," or, somewhat more formally, through mediation. If these measures fail to produce accord, the parties may proceed to what the Act calls a "due process hearing" before a state or local educational agency. And at the conclusion of the administrative process, the losing party may seek redress in state or federal court.

*Id.* at 391-92 (citations omitted).

In an appeal of a special education due process hearing, the IDEA directs that the Court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C). As used in this provision, "appropriate" means "'appropriate' in light of the purpose of the Act." *Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359, 369 (1985).

Under this provision, the Court "is required to accord due weight to the hearing officer's findings, but it must ultimately reach an independent decision based on the preponderance of the evidence." *Seth B. ex rel. Donald B. v. Orleans Par. Sch. Bd.*, 810 F.3d 961, 966 (5th Cir. 2016) (omitting internal quotation marks, footnote, and citation). In other words, "a district court reviews a hearing officer's decision 'virtually de novo.'" *Jennie W. ex rel. H.W. v. Comal Indep. Sch. Dist.*, 32 F.4th 454, 464 (5th Cir. 2022) (quoting *Seth B.*, 810 F.3d at 967). Courts review the administrative record and any additional evidence requested to determine whether "there has been compliance with IDEA's processes and that the child's educational needs have been appropriately addressed." *Seth B.*, 810 F.3d at 967 (citations omitted).

Courts err when they hold that the Act requires the State "to maximize the potential of each

handicapped child commensurate with the opportunity provided nonhandicapped children." *Rowley*, 458 U.S. at 200. Instead, "Congress sought primarily to identify and evaluate handicapped children, and to provide them with access to a free public education." *Id*. Within "the congressional purpose of providing access to a 'free appropriate public education' is the requirement that the education to which access is provided be sufficient to confer some educational benefit upon the handicapped child." *Id*. The Act provides a "basic floor of opportunity" that "consists of access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child." *Id*. at 201. Given this basic floor, the IDEA clearly does not require States to provide a disabled child the best of all possible educational programs or a program that provides for developing a child's full potential. *See id*. at 200-01. Congress intended "that the services provided handicapped children be educationally beneficial, whatever the nature or severity of their handicap." *Id*. at 201 n.23.

That a reviewing court bases "its decision on the 'preponderance of the evidence' is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Id*. at 206 (addressing predecessor statute to § 1415). Thus, "the statutory authorization to grant 'such relief as the court determines is appropriate' cannot be read without reference to the obligations, largely procedural in nature, which are imposed upon recipient States by Congress." *Id*. Accordingly, the Court's inquiry is whether (1) the State has complied with the procedural requirements of the IDEA and (2) "the individualized educational program developed through the Act's procedures [is] reasonably calculated to enable the child to receive educational benefit." *Id*. at 206-07. Courts cannot require more than compliance with these two requirements. *See id*. at 207.

But *Rowley* "expressly declined 'to establish any one test for determining the adequacy of educational benefits' under the Act." *Endrew F.*, 580 U.S. at 399 (quoting *Rowley*, 458 U.S. at

202).

> While *Rowley* declined to articulate an overarching standard to evaluate the adequacy of the education provided under the Act, the decision and the statutory language point to a general approach: To meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances.
>
> The "reasonably calculated" qualification reflects a recognition that crafting an appropriate program of education requires a prospective judgment by school officials. The Act contemplates that this fact-intensive exercise will be informed not only by the expertise of school officials, but also by the input of the child's parents or guardians. Any review of an IEP must appreciate that the question is whether the IEP is *reasonable*, not whether the court regards it as ideal.

*Id.* (citations omitted).

Even though "*Endrew F.* provides more clarity for what constitutes an appropriate IEP," its standard does not render inapplicable Fifth Circuit precedent that predated it. *E.R. ex rel. E.R. v. Spring Branch Indep. Sch. Dist.*, 909 F.3d 754, 765 (5th Cir. 2018) (per curiam) (relying on *Cypress-Fairbanks Indep. Sch. Dist. v. Michael F. by Barry F.*, 118 F.3d 245 (5th Cir. 1997)). To determine "whether an IEP is reasonably calculated to provide a meaningful educational benefit under the IDEA," and thus appropriate, *Michael F.* sets out the following four factors or indicators:

> (1) the program is individualized on the basis of the student's assessment and performance; (2) the program is administered in the least restrictive environment; (3) the services are provided in a coordinated and collaborative manner by the key "stakeholders"; and (4) positive academic and non-academic benefits are demonstrated.

118 F.3d at 253. These factors were derived from the implementing regulations of the IDEA. *See id.* at 253 n.29. *Endrew F.* did not "render the *Michael F.* factors inapplicable," rather the two cases "fit together." *E.R.*, 909 F.3d at 765; *accord H.W.*, 32 F.4th at 465. Indeed, "*Endrew F.* did not eliminate, nullify, nor modify this circuit's practice of applying the *Michael F.* factors when evaluating the sufficiency of a child's IEP." *A.A. v. Northside Indep. Sch. Dist.*, 951 F.3d 678, 690 (5th Cir. 2020).

Some courts refer to the factors as "the *Michael F.* test," *see*, *e.g.*, *Richardson Indep. Sch.*

*Dist. v. Michael Z*, 580 F.3d 286, 294 (5th Cir. 2009), but courts are not required to consider or weigh these factors in any particular way, *Klein Indep. Sch. Dist. v. Hovem*, 690 F.3d 390, 396 (5th Cir. 2012). Even though the Fifth Circuit has "'never specified precisely how these factors must be weighed,' . . . it has long held that the fourth factor is critical." *Renee J. ex rel. C.J. v. Hous. Indep. Sch. Dist.*, 913 F.3d 523, 529 (5th Cir. 2019) (quoting *Michael Z*, 580 F.3d at 293); *accord H.W.*, 32 F.4th at 465.

Because the factors are "intended to guide a district court in the fact-intensive inquiry of evaluating whether an IEP provided an educational benefit," the courts do "not legally err by affording more or less weight to particular *Michael F.* factors." *Michael Z*, 580 F.3d at 294. Nevertheless, because "the whole educational experience, and its adaptation to confer 'benefits' on the child, is the ultimate statutory goal," courts should consider the factors "[f]rom this holistic perspective." *Hovem*, 690 F.3d at 397. Indeed, the Fifth Circuit has reiterated that courts must "review each student's case in a fact-intensive, individualized, holistic manner." *H.W.*, 32 F.4th at 468.

To determine whether an IEP provides a meaningful "educational benefit," courts must look beyond mere "weaknesses caused by [the student's] learning disability," they must instead focus on the student's "overall academic record" at the school. *See Hovem*, 690 F.3d at 397. Stated differently, "overall educational benefit, not solely disability remediation, is IDEA's statutory goal." *Id*. at 398. To assess an individual student's progress, courts "must look to [the student's] overall academic success, not whether [his or her] disability has been remedied." *H.W.*, 32 F.4th at 469. Progress on "IEP goals and objectives, as well as [recorded] test scores and percentile rankings, can aid this process, but no one factor can overwhelm it." *Id*.

Furthermore, "the *Rowley* test does not advance [a court's] inquiry when the question presented is whether the Act's mainstreaming requirement has been met." *Daniel R.R.*, 874 F.2d at 1045. Satisfaction of this requirement is not evaluated "in the abstract"; instead "that laudable

policy must be weighed in tandem with the Act's principal goal of ensuring that the public schools provide handicapped children with a free appropriate public education." *Id*. at 1044-45. For such circumstances, which is also referred to as the least-restrictive-environment or LRE, the Fifth Circuit has "stated a flexible, two-part test." *R.H. v. Plano Indep. Sch. Dist.*, 607 F.3d 1003, 1013 (5th Cir. 2010) (relying on *Daniel R.R.*, 874 F.2d at 1048).

> First, [courts] ask whether education in the regular classroom, with the use of supplemental aids and services, can be achieved satisfactorily for a given child. If it cannot and the school intends to provide special education or to remove the child from regular education, [courts] ask, second, whether the school has mainstreamed the child to the maximum extent appropriate.

*Daniel R.R.*, 874 F.2d at 1048; *accord R.H.*, 607 F.3d at 1013. Various factors may impact both inquiries and "no single factor is dispositive in all cases." *Daniel R.R.*, 874 F.2d at 1048. Courts instead conduct "an individualized, fact-specific inquiry that requires" careful examination of "the nature and severity of the child's handicapping condition, his [or her] needs and abilities, and the schools' response to the child's needs." *Id*. Furthermore, LRE "denotes 'not only freedom from restraint, but the freedom of the child to associate with his or her family and able-bodied peers' to the maximum extent possible." *Teague Indep. Sch. Dist. v. Todd L.*, 999 F.2d 127, 128 n.2 (5th Cir. 1993) (quoting *Sherri A.D. v. Kirby*, 975 F.2d 193, 207 n.23 (5th Cir. 1992)). Importantly, "*Michael F.* and *Daniel R.R.* are not in conflict"; instead, the "analysis of the second *Michael F.* factor . . . is guided by *Daniel R.R.*" *R.H.*, 607 F.3d at 1013. In fact, when the issue is "whether the Act's mainstreaming requirement has been met, the second *Michael F.* factor is guided by the two-part test set out in [*Daniel R.R.*]." *H.W.*, 32 F.4th at 465.

Additionally, when "assuring that the requirements of the Act have been met, courts must be careful to avoid imposing their view of preferable educational methods upon the States." *Rowley*, 458 U.S. at 207. The IDEA left "primary responsibility" for formulating the educational program "and for choosing the educational method most suitable to the child's needs . . . to state and

local educational agencies in cooperation with the parents or guardian of the child." *Id*. "Congress left the choice of educational policies and methods where it properly belongs—in the hands of state and local school officials." *Daniel R.R.*, 874 F.2d at 1048. It is not the role of the courts "to second guess state and local policy decisions; rather it is the narrow one of determining whether state and local school officials have complied with the Act." *H.W.*, 32 F.4th at 464 (quoting *White*, 343 F.3d at 377).

"Because the IDEA 'creates a presumption in favor of a school system's education plan,' the burden of proof rests on the party challenging the plan." *Id*. (quoting *White*, 343 F.3d at 377). In the Fifth Circuit, the "party attacking the appropriateness of an IEP established by a local educational agency bears the burden of showing why the IEP and the resulting placement were inappropriate under the IDEA." *Michael F.*, 118 F.3d at 252. The challenging party bears that burden at both the administrative and district court levels. *Richardson Indep. Sch. Dist. v. Michael Z*, 580 F.3d 286, 292 n.4 (5th Cir. 2009).

"Although school districts are required to provide a free appropriate public education—a FAPE—to all eligible students, a district's obligations vary depending on the circumstances of the student and her placement." *Dallas Indep. Sch. Dist. v. Woody*, 865 F.3d 303, 309 (5th Cir. 2017). Some appeals, like the one now before the Court, require consideration of the IDEA and its regulations that "impose obligations on the public-school district even for students who are being educated in private schools." *See id*. (citing 20 U.S.C. § 1412(a)(10); 34 C.F.R. §§ 300.130–300.148).

The statutory framework permits placement of a child "in a private school without consent of the public school." *Id*. (citing 20 U.S.C. § 1412(a)(10)(C)). In general, Subchapter II (Assistance for Education of all Children with Disabilities) of Chapter 33 (Education of Individuals with Disabilities) of Title 20 of the United States Code

> does not require a local educational agency to pay for the cost of education, including special education and related services, of a child with a disability at a private

> school or facility if that agency made a free appropriate public education available
> to the child and the parents elected to place the child in such private school or fa-
> cility.

20 U.S.C. § 1412(a)(10)(C)(i). That general rule is subject to § 1412(a)(10)(A) and various "pro-

visions address when the costs of the special education must be reimbursed, which largely turn on

whether the public school offered FAPE." *Woody*, 865 F.3d at 309. Therefore, "if the District

offered a proper and timely FAPE, there is not an obligation to reimburse for private-school ex-

penses." *Id*. at 314.

Further, as recognized in *Woody*, the Supreme Court has held that § 1412(a)(10)(C) is not

"the exclusive source of authority for courts to order reimbursement when parents unilaterally

enroll a child in private school." *Id*. (quoting *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 241

(2009)). Looking to its prior precedents that dealt with reimbursement under § 1415, which pro-

vides "the general requirements for reimbursement under IDEA," the Supreme Court stated:

"IDEA authorizes reimbursement for the cost of private special-education services when a school

district fails to provide a FAPE and the private-school placement is appropriate, regardless of

whether the child previously received special education or related services through the public

school." *Id*. at 314-15 (quoting *Forest Grove*, 557 U.S. at 247).

"Parents 'are entitled to reimbursement *only* if a federal court concludes both that the public

placement violated IDEA and the private school placement was proper under the Act." *Forest

Grove*, 557 U.S. at 246 (quoting *Florence Cty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 15 (1993)).

But "even then courts retain discretion to reduce the amount of a reimbursement award if the eq-

uities so warrant." *Id*. at 246-47. And when "considering the equities, courts should generally pre-

sume that public-school officials are properly performing their obligations under IDEA." *Id*. at

247. These three factors—whether the school district provided a FAPE, whether the parents chose

an appropriate private placement, and the equities—were first set out by the Supreme Court in

1985. *See Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359, 369-74 (1985).

### III. APPELLATE CHALLENGE

Appellant argues that the SEHO erred in finding that SCUCISD procedurally and substantively complied with the requirements of the IDEA. ECF No. 16 at 5. He also argues that the hearing officer's decision is not entitled to deference for a variety of reasons. *Id.* at 16-17. He submits that if the Court determines that the SEHO erred and finds that the District has violated the procedural or substantive rights of the parents or student under the IDEA, then the Court may grant such relief as is appropriate. *Id.* at 2-3.

As set out previously, as the party challenging the District's eligibility determination or offer of services under the IDEA, Plaintiff bears the burden to prove that the District has denied Z.W. a FAPE. Plaintiff may carry that burden by showing that (1) the District failed to comply with the procedures of the IDEA or (2) the developed IEP was not reasonably calculated to enable Z.W. to receive an educational benefit. *See Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 206-07 (1982). The procedural inquiry of prong one requires a reviewing "court not only to satisfy itself that the State has adopted the state plan, policies, and assurances required by the [IDEA], but also to determine that the State has created an IEP for the child in question which conforms to the requirements of [the transitional services provision of the IDEA]." *Id.* at 206 n.27 (citing 20 U.S.C. § 1401(19), now found at § 1401(34) and 34 C.F.R. § 300.43).

Although a court's "review of an IEP must be limited to whether the IEP is *reasonable*, not ideal," *Jennie W. ex rel. H.W. v. Comal Indep. Sch. Dist.*, 32 F.4th 454, 464 (5th Cir. 2022) (citing *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 580 U.S. 386, 399 (2017)), the reasonableness analysis is guided by the statutory definition of FAPE" and its "procedural

requirements," *Endrew F.*, 580 U.S. at 401 (citing §§ 1401(9), (29)). As noted by the Supreme Court, "the procedures are there for a reason, and their focus provides insight into what it means, for purposes of the FAPE definition to 'meet the unique needs' of a child with a disability." *Id.* (quoting §§ 1401(9), (29)).

The SEHO addressed three issues: (1) whether the District was able to provide a FAPE to Z.W.; (2) whether the District denied a FAPE to Z.W. due to procedural violations of the IDEA; and (3) whether private and residential placements were appropriate. R. 19-24. Several factors contribute to the complexity of this appeal. First, the appeal spans two full school years—Eighth (2019-2020) and Ninth Grades (2020-2021) with extended school years preceding and following the Eighth Grade. Thus, the District developed multiple IEPs. Further, at no point during this time frame did Z.W. attend school in the District. In addition, Z.W. received his education at multiple locations due to varying levels of behavioral issues. The one constant apparent in this case is the ever-changing context surrounding Z.W. Although the Court may be tasked with considering a moving target comprised of changing behavioral issues, school years, and proposed educational plans, the substantive challenge is one of reasonableness, not perfection. And the District's proposed educational program and placement need only be reasonably calculated to provide Z.W. with required educational and non-educational benefits.

Appellant does not challenge whether the State has adopted a state plan, policies, or assurances required by the IDEA. Nor does Appellant directly question whether any IEP prepared by the District conforms to the requirements of § 1401(34), which like 34 C.F.R. § 300.43, defines transition services. Appellant, furthermore, makes no challenge to any specific finding of fact set forth by the SEHO, although he does contend that that the SEHO omits or otherwise does not consider certain facts leading to erroneous conclusions. The Court has generously included many of these factual findings in the background set forth earlier. It will supplement those facts to the

extent that additional detail is needed in resolving this appeal. It now addresses the challenges raised by Z.W. while recognizing that it may properly decline to consider any matter not raised administratively. *Leigh Ann H. v. Riesel Indep. Sch. Dist.*, 18 F.4th 788, 801 n.15 (5th Cir. 2021).

**A. Deference**

Z.W. contends that the hearing officer's decision is not entitled to deference because (1) the decision only makes "bald conclusions as to the procedural requirements of the IDEA," (2) one cannot determine which facts the SEHO relied upon in reaching her legal conclusions, and (3)

> the SEHO failed to provide any analysis or conclusions of law as to the substantive requirements of the IDEA – namely whether *each* of the proposed IEPs (which were disputed by Plaintiffs and at issue in this matter) offered Z.W. an educational program reasonably calculated to enable him to make progress appropriate in light of his unique circumstances.

ECF No. 16 at 16-17.

The Court need not address each of these contentions. It has already set out the applicable standard of review, including the requirement that it accord due weight to findings of the hearing officer while ultimately making an independent decision based on a preponderance of the evidence. *See Seth B. ex rel. Donald B. v. Orleans Par. Sch. Bd.*, 810 F.3d 961, 966 (5th Cir. 2016). This is virtually a de novo review. *Jennie W. ex rel. H.W. v. Comal Indep. Sch. Dist.*, 32 F.4th 454, 464 (5th Cir. 2022). But such review does not permit "courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 206 (1982). The Court will conduct its review of the administrative record in accordance with these well-established standards. Doing so eliminates the concern about deferring to the SEHO's decision.

The Court, however, will note that, while the SEHO at times spoke in terms of a singular IEP, the SEHO clearly delineated that at issue was whether "the IEPs and BIPs developed by the District for the school years 2019-2020 and 2020-2021 along with any amendments, were reasonably calculated to provide [Z.W.] a meaningful educational benefit under the IDEA." *See* R. 19.

The SEHO, furthermore, specifically identified the relevant IEPS as being "developed in May-June of 2019, November 2019, and March and September 2020." R. 20. The Court finds no legitimate question as to whether the SEHO considered each of the relevant IEPs.

**B. Substantive Violations**

Z.W. asserts four substantive violations: (1) SEHO committed legal error by giving greater deference to the testimony of the District's expert witness's conclusory testimony over Z.W.'s witnesses, ECF No. 16 at 7-11; (2) SEHO applied the wrong legal standard, *id.* at 11-12; (3) SEHO erred by omitting critical facts leading to improper conclusions, *id.* at 12-15; and (4) SEHO erred in finding the failure to include transition plan did not rise to the level of diminishing the sufficiency of the IEP, *id.* at 15-16. Z.W. contends that because "the SEHO failed to discuss or make conclusions of law relating to identified issues, applied incorrect legal standards, and omitted critical facts resulting in erroneous conclusions, the Court should examine the record to reach its own conclusions and give the SEHO decision no deference." *Id.* at 16.

The Court's task is to conduct a de novo review of the evidence while giving due weight to the findings of the SEHO. As noted above, applying the well-established standards for reviewing the administrative record eliminates any concern about deferring to the SEHO's decision. The Court will address the stated substantive violations as needed as it conducts its virtually de novo review.

Under such review, the Court considers whether the developed IEPs are reasonably calculated to enable Z.W. "to receive educational benefit." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 181, 207 (1982). This is the core requirement of any substantive challenge. Of course, the IEP Team must draft the IEP in compliance with the detailed procedures of § 1414, which "emphasize collaboration among parents and educators and require careful consideration of the child's individual circumstances." *Endrew F. ex rel. Joseph F.*

*v. Douglas Cty. Sch. Dist. RE-1*, 580 U.S. 386, 391 (2017).

The SEHO appropriately recognized this core requirement when she first considered whether the District was able to provide a FAPE to Z.W. *See* R. 19. The District likewise recognizes this core requirement as shown by its focus on whether it provided a FAPE under the IDEA. *See* ECF No. 18 at 19-23. This case requires the Court to apply the law to the unique facts and circumstances relevant to Z.W. As recognized by the Supreme Court, educational instruction must be designed to meet the "unique needs" of the student. *See Endrew F.*, 580 U.S. at 399-401; *Rowley*, 458 U.S. at 188. And notably, because crafting an appropriate IEP requires "prospective judgment" by school districts, *Endrew F.* held that schools only need to offer IEPs that are "reasonably calculated to enable" the student to make progress in light of his or her unique circumstances. 580 U.S. at 399.

While the reasonably calculated qualification always has importance when reviewing an IEP, it takes on particular importance in circumstances such as this when the school district has not been educating the student. In these circumstances, there is typically no ability to directly gauge the success or failure of a developed IEP. Instead, those reviewing IEPs in such circumstances must remain even more vested to the reasonably calculated standard. The Supreme Court recognizes the importance of considering the unique needs and specific circumstances of the student eligible for special education and related services. The needs and circumstances necessarily include recognizing that an IEP developed for use for a student being educated outside the school district is not as easily reviewed for positive benefits as an IEP developed for use for a student educated within the school district.

The intense and changing behavioral issues of Z.W. provide additional uniqueness to his circumstances. His entire academic record exhibits ongoing behavioral issues that impact his ability to receive academic benefit regardless of educational location. These issues undoubtedly

worsened in 2019 causing some to recommend residential placement. But the preponderance of the evidence shows that such recommendations were medically driven, and not made primarily for educational purposes. Further, the statutory goal of the IDEA is "not solely disability remediation," there must be some educational benefit. *Klein Indep. Sch. Dist. v. Hovem*, 690 F.3d 390, 398 (5th Cir. 2012). And determining whether the developed IEPs provide meaningful educational benefit requires looking beyond the behavioral issues caused by Z.W.'s learning disability. *See id*. at 397.

When parents examine "the educational opportunities available" for their disabled child, they "may be expected to focus primarily on [their] own child's best interest." *Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036, 1052 (5th Cir. 1989). Similarly, "when state and local school officials are examining the alternatives for educating a handicapped child, the child's needs are a principal concern." *Id*. But, of course,

> other concerns must enter into the school official's calculus. Public education of handicapped children occurs in the public school system, a public institution entrusted with the enormous task of serving a variety of often competing needs. In the eyes of the school official, each need is equally important and each child is equally deserving of his share of the school's limited resources.

*Id*. While the parties strive to provide for Z.W.'s best interests, they disagree as to whether placement in a public versus private educational setting complies with the dictates of the IDEA.

As recognized by the SEHO, *see* R. 19, the guiding legal principles for determining whether the District has provided a FAPE are found in *Cypress-Fairbanks Independent School District v. Michael F. by Barry F.*, 118 F.3d 245 (5th Cir. 1997). *Michael F.* sets out four factors or indicators as to whether a school district has developed an appropriate IEP – meaning that the "IEP is reasonably calculated to provide a meaningful educational benefit under the IDEA." 118 F.3d at 253. The Court thus examines the administrative record to determine whether the proposed IEPs were reasonably calculated to provide a meaningful educational benefit, and thus appropriate under the four *Michael F.* factors.

### 1. __Individualized IEP__

For the first factor – individualized IEP based on student's assessment and performance – the Court has no difficulty in finding that the preponderance of the evidence shows that the District developed the IEPs for the individualized needs of Z.W. The District and a team of professionals evaluated, observed, and assessed his individual abilities and needs multiple times throughout the process. His parents, as well as District staff and teachers, provided input. A representative of OFA attended one ARDC meetings. The record is replete with evidence of meetings between interested parties regarding the various IEPs, and the challenged IEPs are no exception.

As recognized by the SEHO, the District developed three relevant IEPs: "May-June of 2019, November 2019, and March and September 2020." R. 20. Although Z.W. has not attended school in the District since October 2017, thus depriving the District of an opportunity to observe and assess his performance in the specific educational settings recommended, it still conducted ARDC meetings about his educational placements and developed various independent educational programs for him. When the parents contacted the District to fund their unilateral placement of Z.W. at OFA following the negotiated placement there ending in June 2019, the District began the process of developing an ESY program for Z.W. for the summer of 2019. In an effort to develop such program the District obtained a one-page listing of Z.W.'s then present levels of academic and functional performance from OFA. It also sought to observe Z.W. at the private school that he had been attending for eighteen months.

Based upon the received information and a brief observation allowed, the District developed an IEP and created both an ESY program as well as an educational program for the 2019-2020 school year pending an evaluation by the District. *See* R. 640-87. While noting a new FIE was not due until October 10, 2020, the District reviewed the FIE of October 11, 2017. R. 640. It reviewed information from school personnel, information or records from other agencies or

professionals, student communication needs, and, as shown in the deliberation section, concerns of the parents. *Id.* Still, because it recognized that an additional evaluation was needed, it intended to reevaluate Z.W. during the Fall semester. *Id.*

Once the District completed its reevaluation on November 5, 2019, it had a new FIE for Z.W. *See* R. 3335. Although Z.W.'s behavioral issues had worsened since the District began the IEP process in May and June 2019, the District still developed an IEP based on assessments and performance of Z.W. Because IEPs are educational in nature, they remain appropriately individualized even if they may not satisfy every medical need of the student or every desire of the parents. They are not required to provide perfect educational opportunities.

With the new FIE that would remain effective through November 4, 2022, *see* R. 690, the District held an ARDC meeting on November 19, 2019, where it recommended adding another eligibility category for intellectual disability, *see* R. 717-18. At that meeting, the father shared that SpringBrook was "using the district's IEP" but he was uncertain as to whether it was using the District's BIP. R. 3255. The fact that SpringBrook was using the District's IEP provides some support for its appropriateness even with Z.W.'s significant behavioral issues. Although the father initially opposed the ID recommendation, he later sought and obtained ID eligibility from AACOG. *See* R. 2629-33. This essentially confirmed the appropriateness of the District's additional eligibility category. Based upon the reevaluation, the District revised its IEP for Z.W. *See* R. 691-708.

After District staff visited SpringBrook in January 2020, the District convened another ARDC meeting on March 4, 2020, where the staff shared information that SpringBrook was not educationally focused but rather was a hospital setting that focused on the home. R. 3253. Based upon that visit, the ARDC increased support to three to one upon Z.W.'s return to school. *See* R. 3233, 3266. The committee recognized that Z.W. had turned fourteen in December 2019, noted

49

that the March 4, 2020 meeting was a reconvened ARD from November 2019, and stated that the committee would address a transition plan at the next ARD. R. 3233.

At the next ARDC meeting (September 30, 2020), the District discussed a transitional plan, but was unable to formulate one because Z.W. was at SpringBrook, his parents declined to attend the meeting, and they had not provided requested information. *See* R. 3279, 3282-83, 3285-86. Committee notes showed that the District sought parent participation, but they did not attend. R. 3317. Given a lack of more recent information, the District relied on prior information to make an IEP for the 2020-2021 school year. R. 3279, 3285. Most notably, it recognized that SpringBrook's focus was on parent and family training rather than academics; that Z.W. had regressed academically since going there; and that, according to a "team lead" from SpringBrook, the District "could definitely" meet Z.W.'s "educational needs." R. 3285-86.

From the foregoing recitation of evidence and a review of the totality of the record, the Court finds from a preponderance of the evidence that the District developed multiple IEPs for Z.W. Each of these programs were individualized on the basis of Z.W.'s assessment and performance. That the last IEP required the District to rely on earlier information does not detract from the individualized nature of the developed educational program. Further, as found by the SEHO, *see* R. 21, the absence of a transitional plan in the last IEP does not diminish its sufficiency. The District explained that the parents had declined to attend the ARDC meeting in which transition services were first discussed and that it would complete a transition supplement "as soon as" it "is able to work with student and/or parents to gather needed information." R. 3286. Delaying a transition plan under these circumstances appears warranted without diminishing the sufficiency of the IEP.

Based on its diligent efforts, the District prepared each IEP with the information it had. Furthermore, that the IEPs shared common characteristics despite changing circumstances reflects

their prospective nature coupled with a lack of actual placement due to Z.W. attending school at OFA, SpringBrook through Einstein Academy, and ultimately Avondale. The common characteristics do not reflect a failure of the District to individualize the educational programs based on assessment and performance of Z.W. The preponderance of the evidence shows that, with each IEP, the District strived to develop an individualized educational program so as to enable Z.W. to receive educational benefit in light of his circumstances.

Wherever Z.W. has been for education his ongoing behavioral issues impact his ability to receive academic benefit, and those issues undoubtedly worsened in 2019. Even if such worsening had occurred at the District under a developed IEP, such escalation of behavior would not alone be "conclusive evidence that [the] IEP was not sufficiently individualized." *See B.S. b/n/f Justin S. v. Waxahachie Indep. Sch. Dist.*, No. 22-10443, 2023 WL 2609320, at *7 (5th Cir. Mar. 23, 2023) (per curiam). While medical and perhaps personal reasons may make residential placement a better alternative, Z.W. has not shown by a preponderance of the evidence that the District's developed IEPs were not properly individualized. He has not carried his burden to show that the District failed to create individualized IEPs for him.

To comply with the IDEA, "an IEP sufficient under the IDEA" need not be "perfect" nor must it "insulate a child from experiencing hardships while being subject to the IEP. *A.A. v. Northside Indep. Sch. Dist.*, 951 F.3d 678, 691 (5th Cir. 2020). "Instead, the IDEA only guarantees a child a 'basic floor' of opportunity that meets a child's 'unique needs' with 'services that will permit him to benefit from the instruction.'" *B.S.*, 2023 WL 2609320, at *7 (quoting *R.H. v. Plano Indep. Sch. Dist.*, 607 F.3d 1003, 1008 (5th Cir. 2010)). The IDEA does not require more than that. While parents and private facilities may expect more, such expectations do not change the requirements of the Act.

The first *Michael F.* factor or indicator supports the Court finding that the developed IEPs

were reasonably calculated to provide a FAPE to Z.W. That the parents refused all offered services does not dictate a contrary finding. Such refusal merely hinders the ability to directly assess the success or failure of such IEPs.

### 2. Key Stakeholders or Collaboration

Similarly, the record shows that the key stakeholders were major participants in a coordinated and collaborative development of the various IEPs and the services to be provided. There is no doubt that the services to be provided under the developed IEPs were to be provided in a coordinated and collaborative manner by various District personnel, outside personnel, and the parents.

Although the parents did not attend the ARDC meeting of September 30, 2020, the record reflects that at least one parent participated in all other meetings and the District made a concerted effort to have them attend all meetings. The District gave the parents the opportunity to participate at every meeting. The parents provided no reason why one of them could not attend the missed meeting. They simply wanted to postpone the meeting until after the show cause hearing that was scheduled for October 2020. The District provided notice of the meeting and an opportunity for the parents to attend. It sought information from other placements and sought their input. It sought to ease Z.W.'s transition back to the District through a coordinated effort with the staff of OFA. After visiting SpringBrook, it increased staff support for Z.W.'s return to the District. As previously stated, the District relied on numerous professionals and teachers, in addition to obtaining input from the parents at other meetings. It made efforts to obtain information from Dr. Harkins, but the parents refused. It made efforts to provide parental training that were also refused.

The record reflects that everyone had Z.W.'s well-being as a primary objective, even when there was disagreement between the District and the parents. And the Fifth Circuit has specifically rejected "the assertion that parents are denied input into a decision if their position is not adopted." *White ex rel. White v. Ascension Par. Sch. Bd.*, 343 F.3d 373, 377 (5th Cir. 2003). This factor

supports a finding that the developed IEPs were reasonably calculated to provide a FAPE to Z.W.

### 3. Positive Academic and Non-academic Benefits

With respect to demonstration of positive academic and non-academic benefits, the SEHO recognized that this factor was rendered more difficult because the District had yet to implement any developed IEP due to Z.W.'s unilateral placement at private facilities. R. 23.

For the 2019-2020 school year, the District developed IEPs that would place Z.W. in an adaptive learning environment for core subjects with other students with disabilities. R. 662, 714, 3250. The developed IEP for the 2020-2021 school year placed Z.W. in a special education setting for core subjects. R. 3312. For two electives both years, he would be placed in a general education classroom with non-disabled peers. R. 662, 714, 3250, 3312. Under the District's IEPs for both school years, it expected Z.W. "to receive both academic and non-academic benefit from participation in both the general education and special education settings." R. 659, 711, 3247, 3309. Further, Z.W. would "have the opportunity to participate with students without disabilities in all nonacademic, extracurricular and other activities." R. 661, 713, 3249, 3311.

Given the circumstances of this case, the Court cannot say with certainty that the IEPs developed by the District would provide academic and non-academic benefits. But, from the preponderance of the evidence, it does find that the District developed such programs with a reasonable expectation that Z.W. would receive such benefits. Further, although Z.W. had regressed academically since his last full semester with the District, the District had previously provided both academic and non-academic benefits to Z.W. With the prospective nature of the developed IEPs, the preponderance of the evidence supports the Court finding that the IEPs are reasonably calculated to provide Z.W. with the benefits under this factor. Most importantly, moreover, Z.W. has not carried his burden to show that a preponderance of the evidence supports a finding that the IEPs are not so reasonably calculated. For these reasons, the Court finds this factor supports the

53

Court finding that the developed IEPs were reasonably calculated to provide a FAPE to Z.W.

### 4. Least Restrictive Environment

Analyzing this issue requires the Court to consider whether the pertinent IEPs place Z.W. in the least restrictive environment to achieve an appropriate education. No one contends that Z.W. can be satisfactorily educated in the regular classroom. Further, no one disputes that the programs formulated by the District were the least restrictive environment when compared to the private school settings sought by the family. From the District's perspective, the developed IEPs mainstream Z.W. to the maximum extent appropriate as the IDEA requires . It proposed to have Z.W. transition into general education for two electives but this would necessarily be subject to his behavioral issues. The family, however, disagrees with that appropriateness of the less restrictive settings given Z.W.'s behavioral issues. In other words, the family views the developed IEPs as mainstreaming Z.W. beyond the maximum appropriate extent.

Because the District's IEPs provide greater mainstreaming than the alternative private placements sought by the family, this factor appears to favor the District. Substantial evidence, furthermore, supports the District's decision to place Z.W. in the less restrictive environment offered by the District. This is not to say that the record lacks evidence supporting a more restrictive residential placement.

The evidence shows that Z.W. has significant behavioral issues that affect his educational placements in both private and public schools. But Z.W. made progress with his behaviors the last time he was educated in the public-school setting for an entire semester. Despite that progress, he withdrew from school to temporarily move to England. He had behavioral issues when he returned to the District in the fall of 2017 at a different district location. He spent Sixth and Seventh Grades at OFA and his parents sought to continue that unilateral placement for ESY services at the District's expense in 2019. The District developed an IEP for ESY services at the District, and Z.W.

has not carried his burden to show that the developed IEP to be inappropriate based on needing a more restrictive educational environment.

As the school year turned to Fall services, the District's developed IEP for the 2019-2020 school year became the operative IEP. During that Fall semester, Z.W.'s behavioral issues worsened. He was hospitalized and his parents ultimately placed him in a residential facility (Spring-Brook). A preponderance of the evidence shows that medical, rather than educational, purposes drove that placement decision. The facility's focus, moreover, was not on educating Z.W. Spring-Brook provides a highly restrictive environment that often utilizes seclusion and other forms of restraint. Of course, "freedom from restraint" is a benchmark of LRE along with the freedom to associate with "abled-bodied peers to the maximum extent possible." *Teague Indep. Sch. Dist. v. Todd L.*, 999 F.2d 127, 128 n.2 (5th Cir. 1993) (quoting *Sherri A.D. v. Kirby*, 975 F.2d 193, 207 n.23 (5th Cir. 1992)). With respect to Z.W., SpringBrook was a hospital facility that was not for educational purposes. While it had an educational component, that was clearly not the reason for Z.W.'s admission.

To the extent that Z.W. required the highly restrictive environment of SpringBrook, the Court finds such placement inappropriate under the IDEA because it is not "primarily oriented toward enabling the child to obtain an education." *See Richardson Indep. Sch. Dist. v. Michael Z*, 580 F.3d 286, 299 (5th Cir. 2009) (establishing a two-part test for determining when residential placement is appropriate under the IDEA).[5] Although this "is necessarily a fact-intensive inquiry" requiring consideration of multiple factors, including but "not limited to . . . whether the child was placed at the facility for educational reasons and whether the child's progress at the facility is

---

[5] The Court recognizes that *Michael Z* addresses when residential placement is appropriate in context of a school district paying for it under the IDEA—a matter that does not arise until after the Court determines that the District failed to provide a FAPE. But courts may review "the purpose of the private placement as a proxy for understanding the nature of the child's problems, along the way to determining whether the private placement was appropriate." 580 F.3d at 300. Given the argument that the District's IEPs are not restrictive enough to provide an appropriate education, it appears reasonable to touch upon the appropriateness inquiry in the context of LRE.

primarily judged by educational achievement," *id.* at 301, the Court finds from the preponderance of the evidence from the entirety of the record that the SpringBrook placement was primarily for medical and safety reasons, not so that Z.W. could obtain an education. That Z.W.'s behavioral issues affected his ability to receive educational benefit does not transform the issues from a medical/safety issue to one primarily for educational purposes. A need for hospitalization is a medical/safety issue that transcends any educational issue a child might have. The IDEA is not intended to provide for hospitalization admissions or to pay for them if parents unilaterally choose that route.

To the extent Z.W.'s behavioral issues did not require the highly restrictive SpringBrook environment, Z.W. has not carried his burden to show that the 2019-2020 IEP was inappropriate based on needing a more restrictive educational environment than the District but less than that provided by SpringBrook. Similarly, as Z.W. moved on to the Eight Grade, the District's developed IEP for the 2020-2021 school year became the operative IEP. The above discussion regarding SpringBrook applies equally to this IEP. And once Z.W. improved sufficiently to be discharged from SpringBrook on November 22, 2020, Z.W. has not carried his burden to show that the developed 2020-2021 IEP was inappropriate based on needing a more restrictive educational environment available at Avondale. For a residential placement at Avondale to be appropriate under the IDEA, it "must be 1) essential in order for [Z.W.] to receive a meaningful educational benefit." *See id.* Z.W. has not shown that placement at Avondale is essential for him. When "a child is able to receive an educational benefit without the residential placement, even if the placement is helpful to a child's education," the residential placement is inappropriate. *Id.* at 300.

The placement of Z.W. with the District in Fall of 2017 was of such short duration that it is difficult to gauge the adequacy of such placement. But it is clear that it was appropriate to place Z.W. in the District in the Fall of 2016 prior to his temporary move to Europe for the Spring of

2017. Although Z.W.'s behavioral issues worsened in 2019, the Fall of 2016 provides some gauge as to whether the District could provide for his educational and other needs in the least restrictive environment. To be sure, much changed with Z.W.'s transition to a new school environment in the Fall of 2017. The new environment also followed a semester abroad. The Court will not speculate that the less restrictive educational environment proposed by the District was inappropriate. It instead holds Z.W. to his burden to show that the less restrictive environment was inappropriate. He has not done that, except to the extent that he required the highly restrictive environment of Spring-Brook for medical and/or safety reasons, which is itself inappropriate placement under the IDEA given that it is not primarily oriented toward the education of Z.W.

As typical for IEPs, the developed IEPs had built-in flexibility should behavioral issues continue to arise. Although the parents and others may view residential placement as the only appropriate placement, the Court does not find that Z.W. carried his burden to show that the IEPs developed by the District deprived him of a FAPE by placing him in a less restrictive environment than sought by his parents.

To be sure, Dr. Harkins and others recommended residential placement after Z.W.'s behavioral issues escalated in 2019. But even she merely expresses that she "think[s] the residential placement is appropriate for him." R. 4403. However, she also stated:

> If they [(the District)] can control his behavior, then I think he can benefit from what they're teaching, but to be able to do that they have to be able to control his – his behavior, and he has to be in a state of mind where he's – where he's able to work on educational activities.

*Id*. The District exhibited that they could adequately control his behavior the last full semester Z.W. was with the District. Of course, that alone does not justify confidence in the District-developed IEPs. But it does show that, when given a reasonable opportunity, the District has personnel to provide a FAPE despite Z.W.'s behavioral issues. Sure, much has changed since that semester. Z.W. will not be in the same school at the District. His behavioral issues have worsened. Still,

when considering prospective educational programs for a student receiving his education, as little as it might be, in a private setting, courts should not easily discount the expertise of local school officials. Educational methods properly belong with "state and local school officials." *Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036, 1048 (5th Cir. 1989). Courts do not second guess educational decisions; instead, they merely determine whether school officials have complied with the IDEA. *Jennie W. ex rel. H.W. v. Comal Indep. Sch. Dist.*, 32 F.4th 454, 464 (5th Cir. 2022). The Court will not speculate that the developed IEPs fail to provide a FAPE to Z.W. It instead finds that Z.W. has not carried his burden to show that placement within the District is inappropriate for him given his behavioral issues.

### 5. <u>Holistic Review of the Four Factors/Indicators</u>

Now that the Court has addressed each of the four factors individually to some extent, it should be apparent that the *Michael F.* test leads to the conclusion that the developed IEPs were reasonably calculated to provide an educational benefit to Z.W. The test provides a guide through that fact-intensive inquiry. The Court is free to attribute more or less weight to various factors depending on the particulars of a given case. Regardless, the Court has the duty to holistically review and weigh the factors in light of the specifics of this appeal, which is certainly not a run-of-the-mill IDEA appeal. Given that duty and the complications of this case, the Court provides the following insights related to this appeal.

Even though the SEHO found no current ability to assess whether "any benefit has been demonstrated," she found that "the weight of the evidence clearly demonstrates that the District did all that it could in terms of designing an IEP that would provide the Student with a program that is designed to provide education and related services so that the Student will make progress in light of the circumstances and the Student's unique needs." R. 23. Further, after making those observations, the SEHO found that the parents had not carried "their burden to establish that the

program developed by the District did not provide FAPE." *Id*. Through its virtual de novo review, the Court agrees that Z.W. has not carried his burden to show by a preponderance of the evidence that the developed IEPs were insufficient to provide him with a FAPE for the school years in question.

While the individualized nature of the IEPs was complicated by the District's limited observation opportunities, failures to receive information from the parents and other facilities, and Z.W.'s increasing behavioral issues, the Court still finds them sufficiently individualized to favor the District. Conflicting or missing information does not necessarily show that an IEP fails to meet the reasonably calculated requirement. It is Z.W.'s burden to show that a developed IEP does not meet that requirement. This includes showing that it was unreasonable for the District to lack any particular relevant information needed to develop a sufficient IEP. Z.W. has not made any such showing.

Furthermore, that a developed program may not satisfy every medical need of the student, or every desire of his parents, does not make it inappropriate. IEPs concern the educational needs of students, but they are not required to provide perfect educational opportunities. Nor are they required to address every desire of a parent or every medical need. The relevant inquiry is whether they are reasonably calculated to enable the student to receive educational benefit and to make progress appropriate given the student's circumstances. The Court affords great weight to the District developing multiple individualized educational programs for Z.W. covering two full school years. This was no easy task, and while the District would have preferred to have greater information to facilitate the development of the programs, Z.W. has not shown that any missing information affected the individualized nature of the programs.

Similarly, the stakeholder/collaboration factor likewise favors the District although Z.W. asserts some procedural issues that the Court will address in due course. Given the nature of the

circumstances, this factor in conjunction with the individualized factor provides strong support for finding the developed IEPs sufficient to provide Z.W. a FAPE.

Further, although there was no way to definitively know whether the developed IEPs would produce positive academic and non-academic benefits, the prospective nature of the IEPs, in addition to earlier benefits achieved through a District-developed IEP the last full semester the District educated Z.W., indicates that this factor more likely than not favors the District. Based upon the evidence presented, the Court finds the developed IEPs were reasonably calculated to enable Z.W. to make progress in light of his unique circumstances. Under the IEPs, it appears reasonably calculated that he would receive both academic and nonacademic benefits from his educational placements. This important factor is at worst neutral to the District-developed IEPs. Because Z.W. has not shown it to be favorable to him, the Court weighs it favorably to the District.

At this point, even ignoring the last factor, a holistic view of the *Michael F.* factors weighs in the District's favor. The fact that the District's developed IEPs provide a less restrictive environment for educating Z.W. adds additional support. But the LRE factor is complicated by the escalation of behavioral issues of Z.W. in 2019 through his discharge from SpringBrook in November 2020. The family points to this time period and recommended placements stemming therefrom as definitively establishing that the District's IEPs inappropriately place Z.W. in an educational environment less restrictive than required to control his behavioral issues. But Z.W. has not carried his burden on this issue.

For the time periods before and after his admission to SpringBrook, Z.W. has not shown by a preponderance of the evidence that the developed IEPs placed him in an inappropriate educational setting because it was less restrictive than it should be. Even for the time he was admitted to SpringBrook, Z.W. has not shown by a preponderance of the evidence that the less restrictive District setting was inappropriate as an educational setting—he merely provides evidence that

SpringBrook was recommended for safety and medical reasons due to his escalated behavioral issues. In these circumstances, the LRE factor adds further support for the District's IEPs covering the time Z.W. was not in SpringBrook. And even for the time period that Z.W. was in SpringBrook, he has not shown this factor to significantly alter the calculus because the hospitalization was for medical and safety reasons. A student's hospitalization does not mandate a finding that a school district has failed to provide the student with a FAPE. *See A.A. v. Northside Indep. Sch. Dist.*, 951 F.3d 678, 689-91 (5th Cir. 2020).

In short, the *Michael F.* factors weigh in favor of finding that the developed IEPs are reasonably calculated to provide Z.W. with a meaningful educational benefit. Z.W. has not carried his burden to show otherwise. Nor has he otherwise carried his burden to show that the programs prepared by the District deprived him of a FAPE.

### 6. Asserted Substantive Issues

Rather than address substantive issues through the *Michael F.* test, Z.W. asserts four distinct substantive violations, albeit with one focusing on the *Michael F.* test in the posture of omitting facts leading to improper conclusions. While the preceding consideration of the core requirement of any substantive challenge in this appeal might foreshadow the Court's rulings on the asserted substantive issues, it appears prudent to directly address them.

#### a. Legal Error Regarding District's Expert Witness

Z.W. first asserts that the SEHO erred by giving greater deference to the testimony of the District's expert witness over his witnesses.

Even considering that some consider residential placement recommended, Z.W. has not carried his burden to show that any IEP prepared and proposed by the District does not provide a FAPE. Although Z.W. takes issue with considering the District's hired expert, *see* ECF No. 16 at 7-10, the Court finds no need to rely on the expert's testimony to resolve any aspect of this appeal.

Disregarding the testimony does not alter the failure of Z.W. to carry his burden. Even without testimony from the expert, the Court finds that the preponderance of the evidence shows that the District developed appropriate and sufficient IEPs and thus did not deny a FAPE to Z.W. Nevertheless, the Court finds no legitimate basis to disregard the expert testimony. Considering it naturally provides additional support for the Court's ultimate findings.

Relying on out-of-jurisdiction caselaw, Z.W. sets out various legal principles that he presumably believes will help his case. *See id*. at 7. That reviewing courts, however, (1) may reject a credibility determination when there is non-testimonial, extrinsic evidence that supports a contrary credibility determination; (2) should not give greater weight to testimony of district staff than other witnesses; and (3) need not conclude that an IEP is appropriate because a teacher or other professional testifies that it is appropriate, *see id.*, does not compel reviewing courts to view or weigh the evidence in any particular manner. Reviewing courts take a holistic approach and review the entirety of the evidence in deciding an IDEA appeal. As described in the briefing, the caselaw relied upon by Z.W. does not mean that reviewing courts must reject such a credibility determination, give greater weight to non-district witnesses, or conclude that an IEP is inappropriate.

Z.W. quarrels with the SEHO giving greater deference to the testimony of the District's expert witness, Dr. Hughes, over his witnesses. ECF No. 16 at 7-10. The SEHO does state that "[c]redible testimony established that the goals as set forth in the IEP, and based upon the PLAAFPs, to the extent the District could obtain information, are appropriate for this Student." R. 16. While the SEHO does not specifically identify the witnesses she found credible, the decision as a whole reflects that she relied on evidence and testimony from the District in finding that the District was able to provide a FAPE to Z.W. And as mentioned earlier, the SEHO twice cited the testimony of Dr. Hughes. The testimony of the expert is amply supported by the record. Z.W. merely disagrees that the expert found the IEPs appropriate even though they lacked residential

placement.

Z.W.'s complaints against the expert testimony begin with her failure to meet, teach, evaluate, or observe him. ECF No. 16 at 8. But the expert's opinions are consistent with District personnel who did meet, teach, evaluate, or observe him. That complaint provides no basis for discrediting the expert's opinions.

Z.W. also complains that the expert opinions are unsupported and factually inaccurate at times. *Id*. But the opinions are consistent with other evidence of record. And while Z.W. argues that it is factually incorrect to state that he "would remain in a self-contained setting and would not be transitioning to other classrooms," *id*. (citing R. 5537), the expert actually testified that Z.W. would "initially" remain in a self-contained setting "with a high staff to student ration," R. 5537. This is factually accurate and nowhere in the cited testimony does the expert state that Z.W. would not transition to other classrooms.

Z.W. next complains that the expert opined that the District's IEPs were appropriate based on the available data while permitting the District to later modify the programs after obtaining additional information. ECF No. 16 at 8 (citing R. 5446-47). This complaint dovetails with Z.W.'s next argument that the "SEHO improperly considered testimony that the IEPs and BIP would be changed upon Z.W.'s enrollment at SCUCISD." *Id*. at 9 (citing R. 20-21). The Court, however, finds no impropriety in considering evidence that developed IEPs and BIPs are subject to modification as more data becomes available. The evidence shows that such programs and plans are not stagnant—they are subject to modification as circumstances change. The expert's testimony merely reflected that truism. *See* R. 5446. That an IEP is susceptible to change with additional information does not mean that it is inappropriate as drafted.

The evidence considered by the SEHO differs from the retrospective testimony criticized in the case Z.W. relies upon, *R.E. v. New York City Department of Education*, 694 F.3d 167 (2d

Cir. 2012). That case involved "testimony that certain services not listed in the IEP would actually have been provided to the child if he or she had attended the school district's proposed placement." *See* 694 F.3d at 185. The testimony that Z.W. complains about merely states that District staff would gather additional data and make appropriate modifications as necessary after the student returned to the District. *See* ECF No. 16 at 9 (relying on R. 20-21). This is just a reflection of the nature of IEPs and BIPs.

To be clear, the Court does not find the developed IEPs proper because they allow for necessary modifications. The IEPs are proper regardless. The ability to modify reflects the nature of prospective educational programs. An IEP is not deficient merely because it might be changed when circumstances change. Instead, the Court has looked at the various IEPs and has determined them to be sufficient based upon a preponderance of the evidence as a whole. At the very least, Z.W. has not carried his burden to show otherwise.

The nature of IEPs and BIPs demand some flexibility for modification should needed changes become apparent. Such flexibility does not mean that a developed IEP is insufficient to provide a FAPE. It simply recognizes the reality that changes may be needed as more data is available. This reality is even more important for a student like Z.W. who has a history of needing adjustments to his IEPs.

Z.W. contends that a "merely good enough" IEP does not equate to an IEP that "is reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." ECF No. 16 at 9. From the Court's view, the SEHO was not saying that the IEPs developed by the District were merely good enough until they could be modified after obtaining additional information. To the contrary, the SEHO specifically found that

> the weight of the evidence clearly demonstrates that the District did all that it could in terms of designing an IEP that would provide the Student with a program that is designed to provide education and related services so that the Student will make progress in light of the circumstances and the Student's unique needs.

R. 23. She then found that the family "did not meet their burden to establish that the program developed by the District did not provide FAPE." *Id.*

Z.W. also complains that the developed IEPs did not appropriately account for transitions that are a significant trigger for him. ECF No. 16 at 10. The District, however, was well aware of the impact that transitions would have on Z.W. Still, it strived to provide an educational program in the least restrictive environment so as to allow interactions with non-disabled peers. Rather than eliminate such possibility at the outset, the developed IEPs provided enough flexibility to reduce transitions should they prove to be problematic.

### b. Applied Wrong Legal Standard

Z.W. next argues that the SEHO applied the wrong legal standard. ECF No. 16 at 11-12. He premises this error on his view that the SEHO "incorrectly held the IEP to the standard of whether it was appropriate based on the information available to the District and not whether the IEP would enable the child to make progress in light of the child's circumstances." *Id.* at 11. The Court disagrees that the SEHO applied the wrong standard. The appropriateness of all IEPs is judged based on the information available to the District. Unavailable information simply is not incorporated into a developed IEP. It seems that Z.W. wants to use semantics to allege error when none exists. Furthermore, even if the SEHO applied an improper standard, this Court in its virtual de novo review has applied the proper standard as reflected throughout this lengthy decision. This alleged substantive violation provides no basis for reversing the decision of the SEHO or otherwise altering this Court's decision.

### c. Omitting Facts

Z.W. next argues that the SEHO erred by omitting critical facts, leading to improper conclusions. ECF No. 16 at 12-15. This asserted error provides Z.W.'s arguments as to the *Michael F.* factors. *See id.* at 12-13. As this Court has fully and exhaustedly considered the record as a

whole in this appeal while analyzing the *Michael F.* factors, the Court's virtually de novo review has remedied any potential error posed by omitting critical facts. This is not to say that the Court finds any such error—only that, even if the SEHO had erred in this regard, any such error has been remedied. The Court will nevertheless touch upon some of the specific omissions asserted by Z.W.

With respect to the individualized factor, Z.W. argues that the SEHO gave no consideration to his need for a residential placement. ECF No. 16 at 13. First, residential placement did not become an issue until the parents placed Z.W. at SpringBrook. And at that point, the District was well aware that the parents wanted residential placement and that Z.W. was at SpringBrook. More-over, the SEHO recognized Z.W.'s September and October 2019 hospitalizations, as well as the residential placement at SpringBrook. *See* R. 10 ¶¶ 26-29. She also recognized that Dr. Harkins had recommended full-time ABA therapy or alternatively, a residential placement, while also not-ing that Dr. Harkins had testified that home behavioral issues was the basis for that recommenda-tion. *See id.* ¶ 27.She further accurately noted that SpringBrook records and other testimony indi-cated that SpringBrook was considered as a hospitalization. R. 10-11 ¶ 29. From a review of the SEHO's decision as well as the record as a whole, the Court disagrees that the SEHO gave no consideration to the evidence regarding a need for residential placement. It appears that the SEHO disagreed with such a need, found other evidence more persuasive, or recognized that IEPs may still be appropriately individualized even when a need for hospitalization arises.

As for the LRE factor, Z.W. complains that the SEHO considered his access to general education without even considering whether general education is appropriate for him. ECF No. 16 at 13. Z.W. also complains that the SEHO did not consider evidence as to when he would gain access to the general education classroom thus making it impossible to determine what program he would actually receive at the District. *Id.* at 13-14. The Court does not find that these complaints amount to a substantive challenge to the developed IEPs. The District recognized concerns with

Z.W. transitioning back to the District, to a new school, to new teachers, and surely understood concerns about him transitioning to general education for two classes once he had transitioned back. The prospective goal is for such transitions. But even if Z.W. ultimately is unable to achieve that goal, he is still in a less restrictive environment at the District than in any residential placement sought by his parents. The Court has fully considered these complaints as to the LRE factor.

With regard to the benefits factor, Z.W. complains that the SEHO concluded without analysis that the factor is difficult to assess without it being implemented. ECF No. 16 at 14. He merely states that IEPs need not be implemented to make such assessments. The Court agrees with that statement, but also agrees that the SEHO properly noted that assessment of this factor is more difficult without implementation. Indeed, this Court has undertaken the assessment of this factor. The Court sees no error with respect to the benefits factor.

### d. <u>Omission of Transition Plan</u>

Lastly, Z.W. argues that the SEHO erred in finding the failure to include a transition plan did not diminish the sufficiency of the IEP. ECF No. 16 at 15-16. Z.W. essentially asks the Court to give no deference to the SEHO decision on this point. *Id*. at 16. Because the Court gave no deference to SEHO on this point and has addressed the issue earlier, this argument compels no further consideration. The Court, however, will add that this is a procedural rather than substantive error. And like any other noncompliance with procedural requirements of the IDEA, this alleged noncompliance does "not constitute a violation of the right to a FAPE" absent a showing of substantive harm. *Klein Indep. Sch. Dist. v. Hovem*, 690 F.3d 390, 396 (5th Cir. 2012); *accord A.A. v. Northside Indep. Sch. Dist.*, 951 F.3d 678, 685 (5th Cir. 2020). Z.W. has not carried his burden to show substantive harm.

### 7. <u>Substantive Conclusions</u>

From a substantive standpoint—both as argued by Z.W. and as required by *Michael F.*—

the Court finds that Z.W. has not carried his burden to show that the District deprived him of a FAPE for the school years in question. The Court finds from the preponderance of the evidence, after conducting a holistic review of the *Michael F.* factors, that the weight of the evidence supports the District. Because Z.W. has not shown deprivation of a FAPE, there is no need to assess whether OFA, SpringBrook, or Avondale were appropriate placements. But, with respect to SpringBrook, the Court would clearly find it to be an inappropriate placement if it were to find that the District deprived Z.W. of a FAPE during the period of his hospitalization at SpringBrook. Further, the Court has also found that Z.W. has not carried its burden to show that residential placement at Avondale was essential and thus not an appropriate placement either.

## C. Procedural Issues

The alleged procedural noncompliance is threefold—parental participation, predetermined outcome, and lack of adequate notice. *See* ECF No. 16 at 5-7. The District argues that even if the Court were to find a procedural violation, "liability cannot be based solely on a procedural violation of the IDEA." ECF No. 18 at 19. Relying on 20 U.S.C. § 1415(f)(3)(E)(ii) and Fifth Circuit precedent, it identifies three circumstances when a procedural error may rise to the level of an IDEA violation. *See id.*

As recognized by the Fifth Circuit, "not all procedural violations are transformed into substantive violations." *Dallas Indep. Sch. Dist. v. Woody*, 865 F.3d 303, 317 (5th Cir. 2017). To succeed on a procedural basis, Plaintiff must demonstrate that "a procedural violation of the IDEA produced substantive harm." *Adam J. ex rel. Robert J. v. Keller Indep. Sch. Dist.*, 328 F.3d 804, 812 (5th Cir. 2003). In other words, even when a plaintiff shows that the determination of his IEP "was procedurally deficient in some respects," he must still establish "that any procedural deficiency resulted in a loss of educational opportunity or infringed his parents' opportunity to participate in the IEP process." *Id.*

Furthermore, since amendments that became effective on July 1, 2005, 20 U.S.C. § 1415(f)(3)(E)(ii) states:

> In matters alleging a procedural violation, a hearing officer may find that a child did not receive a free appropriate public education only if the procedural inadequacies--
>
> > (I) impeded the child's right to a free appropriate public education;
> >
> > (II) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parents' child; or
> >
> > (III) caused a deprivation of educational benefits.

Because *Adam J.* predates the amendments, the statute provides an additional means for Plaintiff to establish substantive harm by showing that a procedural deficiency impeded Z.W.'s right to a FAPE. *See Dallas Indep. Sch. Dist. v. Woody*, 178 F. Supp. 3d 443, 474 and n.9 (N.D. Tex. 2016), *aff'd in part, rev'd in part*, 865 F.3d 303 (5th Cir. 2017). Even when a procedural violation has occurred, it is only actionable when it satisfies one of the three actionability criteria set forth in 20 U.S.C. § 1415(f)(3)(E)(ii). *Leigh Ann H. v. Riesel Indep. Sch. Dist.*, 18 F.4th 788, 800-01 (5th Cir. 2021); *A.A. v. Northside Indep. Sch. Dist.*, 951 F.3d 678, 685 (5th Cir. 2020).

The SEHO addressed the contention that the District denied Z.W. a FAPE through procedural violations of the IDEA. *See* R. 23. The SEHO found that "the record is clear that parents were provided information in advance of all the ARD meetings, and participated in all but the September 2020 meeting. *Id*. The Court finds that this is factually accurate. With respect to that missed meeting, the SEHO found that the record "demonstrates that the issue was not that the parent was unable to attend, but that he wanted to wait until the [due process] hearing was over." *Id*. The Court also finds this to be factually accurate. At no point does either parent state any reason for being unable to attend the September 2020 meeting—they simply wanted the meeting to occur after the due process hearing scheduled for October 2020.

School districts have an obligation to formulate an IEP for each school year. *See* 20 U.S.C.

§ 1414(d)(2)(A). In September 2020, the District informed the parents of the need for an IEP for the 2020-2021 school year, which had commenced in August 2020. The response from the family's representative requested that the District delay any such ARDC meeting until after the due process hearing to be scheduled in October 2020 and further explained that the parents had no reasonable expectation that the meeting would be successful and that the due process hearing was the proper mechanism for resolving any dispute. R. 3116. Neither explanation provides a reasonable basis for delaying the formulation of an IEP for the 2020-2021 school year. At that point, the due process hearing concerned prior IEPs only. There was no existing dispute as to any IEP for the 2020-2021 school year because no IEP had been formulated for that year yet. Even if the parents lacked a reasonable expectation of success, such expectations provide no reasonable reason to delay for-mulation of an IEP at an ARDC meeting. Three times, the father thereafter requested the District to delay the meeting, but he identified no conflict that would prevent his attendance—he merely relied on the now scheduled October 2020 due process hearing. R. 3115-16. The District did not ignore the request to delay; it instead specifically informed the parents that the meeting was needed to formulate an IEP for the current school year, because none was in place. R. 3115.

The Fifth Circuit has not addressed whether a failure to accommodate a request to delay an ARDC meeting may constitute a denial of a FAPE. But *Adam J.* places the burden on the student and his or her family to demonstrate substantive harm from a procedural violation. As part of that burden, Z.W. must show that request was reasonable under the circumstances. *See J.N. v. D.C.*, 677 F. Supp. 2d 314, 322 (D.D.C. 2010) (recognizing that "a failure to accommodate a parent's reasonable request to reschedule" may constitute "a denial of a FAPE"). And Z.W. has not carried that burden. Without a reasonable request to delay or reschedule, the Court finds no substantive harm from a school district proceeding with a needed ARDC meeting that parents had declined to attend. Absent a showing that the request for delay was reasonable, a school district's failure to

accommodate a request to delay or reschedule does not seriously infringe on a parent's opportunity to participate in the IEP formulation. Under the facts here, Z.W. has not shown that proceeding without a parent at the September 30, 2020 meeting impeded his right to a free appropriate public education. Nor has he shown that proceeding without a parent caused any deprivation of educational benefits.

Proceeding with an ARDC meeting without a parent is not "a *per se* actionable violation of IDEA as a significant impediment to participation in the decision-making process." *Cf. Leigh Ann H. v. Riesel Indep. Sch. Dist.*, 18 F.4th 788, 801 (5th Cir. 2021) (finding no *per se* actionable violation when school excluded an adult student from a manifestation determination). The student or his family has the burden to show substantive harm from any procedural violation. *Id*. That burden has not been carried here.

The SEHO also found that Z.W. had not "established that any procedural violation of the IDEA exists in this matter." R. 23. The Court thus examines the procedural violations raised in the instant appeal. Of course, the only issues preserved for appeal are those raised before the SEHO. *See Leigh Ann H. v. Riesel Indep. Sch. Dist.*, 18 F.4th 788, 801 n.15 (5th Cir. 2021).

As Z.W. points out, *see* ECF No. 16 at 5, he raised procedural issues to the SEHO. *See* R. 459-60 (predetermined program from reconvened May 31, 2019 ARDC), 472-73 (insufficient notice regarding September 2020 ARDC meeting and predetermined placement as shown by a failure to discuss parental objections and a failure to have his special education teacher at meeting). He argues that the District refused to discuss recommended placement, answer questions about qualifications of staff, or consider residential programming. ECF No. 16 at 5-6 (citing R. 668, 671, 4491-92). However, the cited record does not support those arguments.

The District (1) noted the father's disagreement with provided services; (2) noted staff were "empathetic to the parent's hesitations," while expressing confidence that Z.W. would make

progress in the school setting; and (3) continued the ARDC meeting so that "both parties" could "gather additional data in order to reach an agreement." R. 668. This does not reflect a refusal to discuss recommended placement.

With respect to qualifications of staff, when the father asked about staff qualifications, the District said "it would be teachers, paraprofessionals or a combination of both." R. 671. It also clarified that "a 1:3 ratio" means "the number of staff members to students." *Id*. This record does not reflect a refusal to answer the father's questions. If the father wanted more detail about staff qualifications, nothing of record indicates that he was unable to ask for it.

With respect to the alleged refusal to consider residential programming, a director for the District was asked: "And are you aware that on several occasions the W.'s requested consideration of placement for [Z.W.] at a non-public residential facility in Texas, correct?" R. 4489. She initially answered: "At One for Autism? Yes, ma'am." *Id*. When it was clarified that OFA was "non-public day placement" that had also been requested, the focus of the question became "placement at Bayes or Whispering Hills," to which she answered: "That's not through an ARD Committee." R. 4490. She ultimately testified that she did not visit either of those facilities, send them records, or speak to anyone there because Z.W. "had an appropriate placement" at the time in question. R. 4491-92. To the extent this might be construed as a refusal to consider residential placement, it seems confined to circumstances when the student already had an appropriate placement, and it was outside the context of any ARDC. The Court does not see this as a procedural deficiency that resulted in any substantive harm to Z.W. At the very least, Z.W. has failed to show any substantive harm from any failure to consider placement at Bayes or Whispering Hills.

Z.W.'s first predetermination issue is limited to the reconvened May 31, 2019 ARDC. *See* ECF No. 16 at 6 (citing R. 459-60). But that was the second of three ARDC meetings, which culminated in an IEP on June 12, 2019, that provided ESY for the summer of 2019. Z.W. has not

carried his burden to show that the District predetermined anything with respect to the May 31, 2019 ARDC. Nor has he carried his burden to show that he was substantively harmed by any predetermination at that meeting.

Z.W. next argues that the District failed to provide adequate notice of the September 30, 2020 ARDC meeting in violation of 34 C.F.R. § 300.321(a)(6) and (c) and 34 C.F.R. § 300.322(b)(1). ECF No. 16 at 6. He argued to the SEHO that the District's failure to comply with 34 C.F.R. § 300.322(a)(1) and (b)(1) seriously infringed on his parents' ability to meaningfully participate in the September 2020 ARDC meeting. R. 472. Section 300.322(a) requires school districts to

> take steps to ensure that one or both of the parents of a child with a disability are present at each IEP Team meeting or are afforded the opportunity to participate, including—
>
>> (1) Notifying parents of the meeting early enough to ensure that they will have an opportunity to attend; and
>>
>> (2) Scheduling the meeting at a mutually agreed on time and place.

Z.W. asserts no violation of § 322(a)(2) so any violation of that provision is not before the Court.

Section 300.322(b)(1) addresses what must be included in the notice required under (a)(1). Among other things not relevant here, the notice must "(i) Indicate the purpose . . . of the meeting and who will be in attendance . . . ." Z.W. argued to the SEHO that his parents lacked notice as to "who would be attending or what the purpose of the meeting was beyond that it was an 'annual' ARDC." R. 472. He does not explain how any missing information affected his parents' ability to meaningfully participate in the September 2020 meeting or otherwise caused him substantive harm. *See* ECF No. 16 at 6. While the purpose of that meeting appears clear enough from the information provided, the notice does fail to identify those expected to attend.

This failure requires brief consideration of 34 C.F.R. § 300.321, which addresses the composition of the "IEP Team." This provision flows directly from 20 U.S.C. § 1414(d)(1)(B)(vi),

which defines "IEP Team" as "a group of individuals composed of" up to seven types of individuals, including "at the discretion of the parent or the agency, other individuals who have knowledge or special expertise regarding the child, including related services personnel as appropriate."

In this case, Z.W.'s relevant IEP Team was first put together in May and June 2019. Z.W. makes no notice issue about any ARDC meeting other than the one held on September 30, 2020. And for that one, he merely argues that he had "no notice of who would be attending or the purpose of the meeting . . . beyond that it was to determine the Student's program for 2020-2021. ECF No. 16 at 6. Consequently, at most, the alleged procedural issue affects only the IEP for the 2020-2021 school year. Furthermore, even accepting that there were procedural deficiencies in the notice regarding the September 30, 2020 meeting, Z.W. has not carried his burden to show substantive harm from any deficiency. The various ARDC meetings addressed similar issues regarding Z.W. Both the parents and the District understood the process. The parties' lengthy and ongoing educational relationship cuts against finding substantive harm resulting from alleged notice deficiencies limited to one ARDC meeting that the parents chose to miss. At the very least, the District provided the parents an adequate opportunity to participate—the parents simply chose not to attend. They had also failed to provide requested updates. The Court's independent research has revealed no instance of any federal decision addressing such alleged violations of the regulations, let alone, finding substantive harm in such circumstances.

Z.W. next argues that he "alleged and provided evidence that the June 2019 ARDC procedurally violated the IDEA by being unduly constituted without participation of a special education teacher working with the Student, which at the time would have been a teacher from Einstein Acamdey [sic] at Springbrook." ECF No. 16 at 6 (citing R. 718-19). Despite the reference to June 2019, Z.W. clearly intends to challenge the November 19, 2019 ARDC meeting. First, the cites to the record refer to that meeting, not the June 2019 meeting. Second, Z.W. was seeking placement

at OFA, not SpringBrook, in June 2019. Third, Z.W. laters refers to the November meeting in the same argument. The Court need not consider this alleged procedural defect because Z.W. has not shown that he presented it to the SEHO. His cites to the record relate to the May 31, 2019 meeting, and the one held in September 2020. *See* ECF No. 16 at 5 (citing to R. 459-60, 472-73). Neither of these cites to the record raise an issue with respect to the November 19, 2019 ARDC meeting. *See* R. 459-60 (discussing May 31, 2019), 472-73 (discussing September 30, 2020).

In any event, Z.W. argues that an "IEP meeting in which the team considers a placement in a private school must include a representative of the school or facility." ECF No. 16 at 6 (citing 34 C.F.R. § 300.325(a)(2)). Section 300.325 addresses private school placements by public agencies. "Before a public agency places a child with a disability in, or refers a child to, a private school or facility, the agency must initiate and conduct a meeting to develop an IEP for the child in accordance with §§ 300.320 and 300.324." *Id*. § 300.325(a)(1). The public agency must also "ensure that a representative of the private school or facility attends the meeting." *Id*. § 300.325(a)(2).

Relatedly, Z.W. argues that "[t]he exclusion of such teachers prevented the November ARDC from being duly constituted under the IDEA." ECF No. 16 at 6 (citing *S.H. ex rel. A.H. v. Plano Indep. Sch. Dist.*, 487 F. App'x 850, 865 (5th Cir. 2012) (per curiam)). That argument, however, is not necessarily supported by *S.H.* In *S.H.*, the district court agreed with the SEHO that the composition of an ARDC meeting "did not meet procedural requirements" of 20 U.S.C. § 1414(d)(1)(B). 487 F. App'x at 864. The Fifth Circuit agreed that the meeting composition was "procedurally defective because it excluded a required member." *Id*. at 865. But, because the meeting in question lacked a teacher from both the public and private schools, the Fifth Circuit did not decide whether a district teacher "who would soon function" as the student's teacher would suffice alone. *Id*.

The November 19, 2019, ARDC meeting was well attended. *See* R. 717 (listing thirteen

attendees). Although the meeting lacked anyone associated with SpringBrook or its Einstein Academy, district attendees included two special education teachers, a general education teacher, the District Administrator, the Director of Special Education, and five individuals who had conducted assessments. *See id*. The Court agrees with the Fifth Circuit's suggestion that a soon-to-be teacher satisfies the requirements of § 1414(d)(1)(B). To hold otherwise would mean that a school district could never comply with the requirements when forming the initial "IEP Team" prior to a child becoming a student at the district. Of course, both the parents and the school district have discretion to include representatives of private schools who have "knowledge or special expertise regarding the child." *See* 20 U.S.C. § 1414(d)(1)(B)(vi). Nothing indicates that Z.W. exercised such discretion or voiced any concern or objection at the meeting that SpringBrook was not represented.

Z.W. argues that "[t]o the extent SCUCISD did not believe a representative from Einstein Academy was a mandatory member, such is indicative of a predetermination and a failure to meaningfully consider Student's residential placement, nor could an IEP based on assessment and performance be created." ECF No. 16 at 6-7. The Court disagrees that the District's failure to invite an Einstein Academy representative reflects any predetermination. Nor does it reflect a lack of meaningful consideration of residential placement. It does not preclude the District from creating an IEP based on assessment and performance. School districts are not required to create an ideal educational program. They must only offer an IEP that is reasonably calculated to enable the student to make appropriate progress given the student's individual circumstances. Z.W. has not carried his burden that the District failed in that regard.

Given Z.W.'s "parents' active participation in the crafting of his IEPs and the absence of any demonstrable 'lost educational opportunity,'" one may "conclude that the procedural requirements of the IDEA were substantially satisfied," even if there may be some procedural issues. *Adam J. ex rel. Robert J. v. Keller Indep. Sch. Dist.*, 328 F.3d 804, 812 (5th Cir. 2003). Z.W.,

furthermore, has not established by a preponderance of the evidence that any procedural deficiency impeded his right to a FAPE. In this case, of course, no parent attended the September 30, 2020 ARDC meeting regarding the IEP for the 2020-2021 school year. But the preponderance of the evidence shows that such absence was by their own choice.

When parties have engaged in a longstanding effort to develop multiple individualized educational programs for a student, it is not surprising that there may be some procedural missteps. But a procedural misstep alone does not warrant relief. The student must show that a procedural misstep produced substantive harm. On the current showing in this case, the Court will not disturb the findings of the SEHO. Z.W. has not shown that any procedural deficiency resulted in a lost educational opportunity, infringed any opportunity of his parents to participate in the IEP process, or impeded his right to a FAPE.

### D. Summary and Appropriate Relief

Undoubtedly, this is a difficult case for all involved. But it is helpful to remember the purposes of the IDEA. And important to those purposes is placing the burden on the student. Based on the preponderance of the evidence, the Court has made an independent decision while according due weight to the findings of the SEHO. Under that review, it finds that, to the extent the District made any procedural error, Z.W. has not carried his burden to show that such error produced substantive harm. It further finds that Z.W. has not carried his burden to show that the District denied him a FAPE during the relevant school years. The Court thus has no occasion to determine whether his unilateral placement at other facilities was proper.

Having considered relevant factors holistically, the Court finds that the preponderance of the evidence shows that educating Z.W. in regular classes cannot be achieved satisfactorily and the District has tailored Z.W.'s special education and services to his unique needs even with the plan to transition him into general education classes for two electives. Of course, in reviewing the

prospective judgment by the school district the Court appreciates that the inquiry is whether the Court finds the IEPs reasonable, not whether it regards them as ideal. The preponderance of the evidence shows that the challenged individualized education programs are reasonably calculated to enable Z.W. to receive a meaningful and appropriate educational benefit, to make progress appropriate in light of his circumstances, and to mainstream him to the maximum extent possible.

With those findings on the preponderance of the evidence, the Court must next determine what relief is appropriate. *See* 20 U.S.C. § 1415(i)(2)(C). Appellant asks the Court to (1) reverse the determination of the SEHO; (2) find that the District denied him a free appropriate public education; (3) find that he is entitled to reimbursement in connection with his attendance at One for Austin, SpringBrook, and Avondale; (4) award reasonable attorneys' fees; and (5) award interest. ECF No. 16 at 19-20. Based on the preponderance of the evidence, and the failure of Z.W. to carry his burden, such relief is clearly not appropriate.

Conversely, the District asks the Court to affirm the decision of the SEHO and deny Z.W.'s requests for relief in their entirety. *See* ECF No. 18 at 30. And, based on the preponderance of the evidence, and the failure of Z.W. to carry his burden, the Court finds it is appropriate to affirm the findings and determination of the SEHO. Such affirmance is appropriate in light of the purposes of the IDEA, which is principally to ensure that public schools provide eligible students with a free appropriate public education.

## IV. CONCLUSION

For the foregoing reasons, the Court affirms the Decision of the Hearing Officer. By separate document, the Court will enter judgment affirming that decision.

**IT is so ORDERED this 26th day of January 2024.**

**JASON PULLIAM**
**UNITED STATES DISTRICT JUDGE**